No. 1936.—R. E. DIAMOND *v.* G. L. CAIN.

The omission in the Constitution of 1868 of article 138 of the Constitution of 1864, left the whole subject of the corporation of the city of New Orleans and its police regulations under the power and discretion of the Legislature.

Act No. 1, approved July 9, 1868, creating a Board of Police Commissioners for the City of New Orleans and giving them full power to remove and appoint the police force, and repealing all other acts and parts of acts in conflict with its provisions, divested the Mayor of the city of New Orleans of all authority to appoint a chief or other policeman. Articles 159 and 42 of the Constitution of 1868 were not violated in the passage of this act. (See acts Nos. 74 and 145 of 1868, and Nos. 60 and 92 of 1869.)

The appointment of a chief of police by the Mayor of the city of New Orleans after the passage of act No. 1, approved on the ninth of July, 1868, was without any legal force or effect, and such officer so appointed had, by virtue of his appointment, no interest in the office of chief of police, nor in the office of superintendent of metropolitan police created by act No. 74, approved September 14, 1868 Having no interest in the office, he was not entitled to the writ of *quo warranto* nor injunction.

A APPEAL from the Sixth District Court, parish of Orleans. *Cooley,* J. *Leovy, R. N. Ogden* and *Alfred Philips,* for plaintiff and appellee. *J. Hawkins* and *E. Filleul,* for defendant and appellant.

ARGUMENT FOR DEFENDANT AND APPELLANT.

I. *The relator is not entitled to a writ of quo warranto:*

A *quo warranto* is only issued for the decision of disputes between parties in relation to the offices in corporations as when a person usurps the character of a mayor of a city, or such like. With regard to offices of a public nature, that is, which are conferred in the name of the State by the Governor, with or without the consent of the Senate, the usurpations of them are prevented and punished in the manner directed by the Penal Code. See C. P., article 868.

Article 869 C. P., provides, that a mandate to prevent the usurpation of an office, in a city or other corporation, may be obtained by any person applying for it.

And article 870 provides, that the court, after having declared the party not qualified, shall direct the corporation to proceed to a new appointment.

It is clear on the face of the pleadings, that these articles, which are the only text upon the authority of which a *quo warranto* can issue, do not apply to George L. Cain. (See the case of Terry *v.* Stauffer, 17 A. R. 311, where the *quo warranto* was denied, under similar circumstances.)

Cain is not a corporation officer; he is appointed by the Board of Metropolitan Police Commissioners, who are appointed by the Governor. (See act 74, 1868, and article 868 C. P.)

Being a subordinate officer of a State department, his commission partakes of the nature of the commission of his superior officers, according to the rule: *Subrogatum sapit naturam ejus cui subrogatur.* See Calvin's Lexicon, verbo *Subrogandus.)* This is self-evident, and requires no further argument. The counsel might well stop here, and this would be enough to dismiss the whole proceeding. But as the public is interested in this case, it is good that the case of the commonwealth should be well, fully and zealously examined and defended, as remarks Cicero. But in a *quo warranto* case, the petition must be in the name of the State, because the State is the party that has the chief interest and almost the sole interest that the franchises should not be abused or usurped. We look in vain in the record, and to the title of the suit, to see the name of the people or State of Louisiana as plaintiff in this case, and we see that the proceedings are conducted in the private name

of the plaintiff, a ridiculous usurpation of the rights of the State; nor is the plaintiff to be listened to, when he pretends to have acted under the two acts of the Legislature of 1868, providing a remedy against usurpation and intrusion into a public office, etc. (Acts No. 58 and 156.)

Because his petitions do not contain a single word or allegation to that effect, nor did he claim to be interested in the office of Superintendent of the Metropolitan Police, nor did he allege that Cain usurped the said office; and moreover, the reading of those two acts shows so clearly that such an action cannot be instituted without the concurrence of the Attorney General, the plaintiff can take nothing by his equivocation, all doubts in such a case being interpreted against him who, having the opportunity of explaining himself, has been the cause of the obscurity found in the pleadings.

The plaintiff has prayed for a writ of *quo warranto,* and to that prayer his petition must be limited.

The nature and rules which govern the proceedings in *quo warranto* are so anomalous, and so different from all the other rules of practice, that it is impossible to cumulate *quo warranto* with other remedies and pleadings in the same suit; the judgment to be rendered in such a suit is dictated by law, and is only intended to remedy one wrong. The pleadings are anomalous in this—that the king or State has nothing to prove, and the *onus probandi* and justification is thrown upon the defendant, and if he fails in his justification, judgment must go for the king or State. These proceedings are also considered in the light of a criminal action. We repeat that the peculiar rules which govern *quo warranto* are repugnant to the other rules of practice, and other matters cannot be heard upon the trial of such issues. See Bouvier's Dictionary, Angel and Ames, Kent's Commentary, and all the authors.

Should, however, the plaintiff be entitled to a writ of *quo warranto,* the defendant, by showing his warrant of appointment, and the law creating the board of metropolitan police, has fully complied with the law, and he would be entitled to a judgment.

II. That by divers acts of the Legislature, the office of chief of police of New Orleans has been abolished and no longer exists; that the Mayor of New Orleans has no authority to appoint any officers or members of the police of New Orleans.

The respondent avers that there is no such office as that of chief of police of New Orleans; he holds the negative. The burden of proof is on the party affirming that such an office exists to prove its existence.

In an action in the nature of a *quo warranto,* the question may be raised whether there is such an office as the defendant or plaintiff has assumed to fill; the object of the Code of Practice relative to such actions is to provide a speedy and effective mode of determining the rights of individuals to discharge the duties of an office; necessarily involves the determination of the existence of the particular office. See 24 New York Reports, p. 86.

The article 133 of the Constitution of 1864, gave to the Mayor of the city of New Orleans the power to *select* the police of the city; the members of the police force were to hold their office during good behavior, removable only for cause by a police commission composed of five citizens appointed by the Governor.

The act No. 14, session acts of 1866, entitled an act "to organize the police of the city of New Orleans, and to create a police board therein," was enacted under the Constitution of 1864. The Constitution of 1868 did not retain the article 133 of the Constitution of 1864, and therefore left the organization of the police force in New Orleans as a proper subject of legislation for a subsequent Legislature.

On the ninth July, 1868, the Legislature passed an act which divested the Mayor of New Orleans of the power of appointing or selecting the

policemen of New Orleans and vested the appointment and administration of the police of New Orleans in a board composed of five police commissioners; that law repealed all laws or parts of laws inconsistent with it, and took effect from its passage. (See acts of 1868, act No. 1.)

On the fourteenth September. 1868, the Legislature passed the act entitled "an act to establish a metropolitan police, and to provide for the government thereof." (See act No. 74, 1868.)

This act gives the exclusive and absolute control of the police of the city of New Orleans, made a part of the metropolitan police district, to the board of "Metropolitan Police." (See section 2 of said act.)

On the seventh October, 1868, the Legislature re-affirmed the act No. 1, creating the Board of Police Commissioners by fixing their salary and allowing them their pay, from the day of their creation to the day they were superseded by the Metropolitan Police act. (See act No. 145, session 1868).

On the nineteenth August, 1868, the Legislature passed an act entitled "an act to determine the mode of filling vacancies for which provision is not made in the Constitution." The first section of this act provides that when a vacancy occurs in any office, State, parish or municipal, the vacancy shall be filled by the Governor. (See act No. 27, 1868.)

It will be seen that the Mayor of New Orleans on the twenty-eighth October, 1868, when it is alleged that he appointed Robert E. Diamond chief of police of New Orleans, violated on that day four acts of the Legislature, to wit: Acts No. 1, 27, 74 and 145, and that his appointment in opposition to the statutes of Louisiana, was nothing but a ridiculous and absurd act of folly, as well as an act of rebellion against the Legislature of Louisiana.

This commission gives no right to Diamond; any assertion of any right under such a commission cannot for one moment be listened to by a tribunal whose first duty is to cause the laws to be observed and obeyed.

The Mayor acted in contravention of law. Article 12 C. C. says, whatever is done in contravention of a prohibitory law is void.

What a strange spectacle this case presents! Those who should be defendants and praying for the mercy of the court, present themselves before the courts with a threatening and defiant attitude. The plaintiff, R. E. Diamond, then has no standing in court. He has made the plea that the metropolitan police act is unconstitutional, because it violates articles 94, 117 and 118 of the Constitution.

Courts of justice do not sit to examine abstract questions of law and to give their opinion about questions which, without any interest, any malignant parties may propound to them. Courts of justice are established for the purpose of settling serious disputes which may arise between citizens in regard to the rights of person and property. The organization and government of the police of the city of New Orleans were entrusted to the municipal corporation, created by the Legislature under the name of the city of New Orleans. In the course of time the Legislature thought proper to divest the corporation of the police power and to vest it in another body; this measure is purely political and administrative, and cannot, under a constitution like ours, which acknowledges the principle of the division of the powers of the government, become the subject of a judicial inquiry. Such a question is beyond the limits of the judiciary power, and exclusively belongs to the two other branches of the government.

The judiciary can only interfere if such legislation deprives a citizen of any vested rights or if it impairs the obligation of contracts.

What vested rights can R. E. Diamond have in the government and police of the city of New Orleans? What contracts in which he has an interest has been impaired?

In what capacity does he present himself? As Chief of Police. Ad-

mitting that his appointment was regular, this would not give him the right to plead the unconstitutionality of such a statute, because the government of the police is not an appendage of his office. He would be a subordinate officer of the corporation of New Orleans, and he has no power to sue for any right belonging to the corporation. He cannot sue *vicariously* for the right of another; he is a self-constituted *vicarius alieni juris* and cannot be heard.

In the second volume of Black's Reports, p. 513, we learn that the city of Sheboygan had issued certain bonds, and a party who had no interest in the matter chose as a pretense for his intervention to argue the unconstitutionality of the measure. The Supreme Court refused to hear him, and said: "We hear of no complaint from the bondholders, it does not belong to the complainant, *vicariously*, to enforce their contract and to protect their rights. Gilman *v.* City of Sheboygan, 2 Black's Reports, page 513.

Our Code of Practice defines the right of action thus: It is the right given to every person to claim judicially what belongs to him. C. P. art. 1.

A plea to the unconstitutionality of a statute was made in the 12th A. R. The Supreme Court first examined into the capacity of the party making the plea and said:

"The act of the Legislature certainly invaded no vested right of a company, which came into being ten years afterward, and it is only for the party whose rights are invaded to plead the nullity of a law impairing the obligation of a contract." Navigation Company *v.* City of New Orleans, 12 A. R. 366.

In New York it has been decided, "That the people cannot set up to invalidate a charter granted by the Legislature, that it confers a power in violation of the Constitution of the United States, as a power to bridge a navigable stream. Such objection, if it were valid, can be taken only by those who have been impeded in lawful commerce." People *v.* Saratoga and Rensselaer Railroad, 15 Wendel Rep. 113; Abbot's New York Dig. vol. 4. p. 643, No. 20.

Robert E. Diamond cannot certainly say that the statutes of Louisiana, passed before he received his commission from Conway, invaded any of his pretended rights which were not then in existence.

Though the undersigned have fully demonstrated that plaintiff or relator in this extraordinary case of *quo warranto* has not shown any right to appear before a court of justice, we will show to your honors that the pleas of unconstitutionality have no foundation in fact and in law.

Does the act No. 74, 1868, violate article 94 of the Constitution? This ground was abandoned in the court below. Article 94 of the Constitution says: "That no judicial power, except as committing magistrates in criminal cases, shall be conferred on any other officers than those mentioned in this title, except such as may be necessary in towns and cities," etc., etc.

There is not a single word and sentence in the act No. 74 which has any reference to that article of the Constitution. In fact, the act No. 74 treats entirely of a different object, and is entirely foreign to that article. The plea is absolutely frivolous, and should a part of a law be unconstitutional, that part only would be declared unconstitutional, and the other parts would be declared constitutional if they do not violate the Constitution.

The law violates article 117 of the Constitution, which says: "That ·no person shall hold at the same time more than one office of trust and profit."

The act No. 74 does not create an office, but it confers new duties ·on the Lieutenant Governor. This act says, "that by virtue of his office he shall be *ex officio* President of the Board of Metropolitan Po-

lice." The conferring of new duties or powers on an officer of the executive department is authorized by the Constitution, when those duties or powers belong to the same department or branch of government; this is the rule of the Constitution. The exception to that rule is found in article 82, which says, "no duties or functions shall be conferred by law on the District or Supreme Court Judges, except those that are judicial;" and in article 94, which says, "that no judicial functions shall be conferred upon any other officers than the judges mentioned in the Constitution, except the judicial powers conferred upon *committing magistrates*." The words *ex officio* mean by virtue of his office, and the Legislature can extend the powers of the Lieutenant Governor as it frequently extends the power of the Governor by making him *ex officio* president of the board of the Charity Hospital, president of the board of emigration, and so on *ad infinitum*.

The Legislature, as to that extension of powers, not being limited by the Constitution, has an absolute and sovereign discretion.

*Malitiis hominum non est indulgendum* is a rule which governs absolutely in matters where nullities are invoked, and if the party invoking the nullity does not show his interest, he is reduced to silence. The principles which we invoke have been sanctioned by the courts of New York: "The power conferred upon the Supreme Court under the laws for opening streets in the city of New York, to appoint commissioners of estimate and assessment, and to review their reports," is not a violation of articles 5 and 7 of the constitution of New York of 1822, by which the judges of that court are forbidden to hold any other office or public trust. The statutes are an extension of the jurisdiction of the court, and not an appointment to office. (See the authorities quoted. Abbot's New York Digest, vol. 1, page 673, No. 296.)

It was also decided in New York:

That the provision of article 6 of the constitution of New York, "that the judges of the Court of Appeals and Supreme Court shall receive a compensation, to be established by law, which shall not be increased or diminished during their continuance in office," does not prevent an additional compensation which is authorized by the Legislature. (Idem, No. 295.)

But admitting that the Legislature had no right to confer new duties upon Lieutenant Governor Dunn, what effect would this provision have upon the rights of Diamond? None at all. It would be immaterial as to the public. It would be in the discretion of the Lieutenant Governor to refuse to perform such duties, as President *ex officio* of the Board of Metropolitan Police, or, following the respectable precedent of the circuit courts of New York, continue *ex gratia* voluntarily to execute the duties entrusted to them by an act declared unconstitutional *because it assigned to the circuit courts ministerial duties*. (See Kent's Commentaries, vol. 1, No. 451.)

At all events, no one could properly bring the question of constitutionality of such a provision, because such a provision divests no one of his vested rights and does not impair the obligation of any contract. The question of constitutionality could only come before the court upon the refusal of the Lieutenant Governor to perform duties imposed upon him by a statute which he would not obey, as in the cases of the circuit judges and North Carolina judges, quoted by Kent.

These authorities apply to our case; and further, as we shall see in a moment, the act No. 74 has been repealed and re-enacted, and all rights of action growing out of the existence of said act in progress of litigation are at an end. No judgment can be rendered under a law which has ceased to exist. Does the act 74 violate article 118 of the Constitution of 1868 ?

That article 118 provides that taxation shall be equal and uniform through the State, etc,

There is not a word about taxation, nor is there any power to levy taxes of any kind given to the Metropolitan Police Board.

By section 27 it is made the duty of the Board to convene as a board of estimate and apportionment, to proceed to make up a financial estimate of the sums required for their expenses, etc., and the proportion of expenses applicable to each of the cities and parishes in the metropolitan district in ratio of the number of police officers and men authorized by this act and employed by such cities and parishes respectively.

The undersigned counsel cannot discover what is unconstitutional in such a provision of a statute, nor has Robert E. Diamond shown what property he possesses that has not been uniformly taxed, and in what manner Cain, who does not belong to the Board of Commissioners of Metropolitan Police, has taxed him unlawfully or impaired any of the obligations of contracts in which he is interested.

Truly never were arguments so devoid of logic and reason presented to any tribunal!

The claim of the relator is not only unfounded in law and in fact, but is only urged for the purpose of brewing trouble, disorder, confusion and anarchy.

IV. The defendant annexed his warrant of appointment according to the article 17 of the metropolitan act, and this is a sufficient, full and complete return to the *quo warranto*, and judgment should have been given for the defendant.

V. That the relator and plaintiff is not entitled to a writ of injunction, nor can the plaintiff obtain an injunction in this case and thus suspend the functions and duties of officers belonging to the executive or legislative branch of the government.

In the case of Terry *v.* Stauffer, 17 A. R. 313, a case which resembles this, an injunction was applied to for the purpose of preventing the defendant from exercising the functions of Register of Voters of New Orleans, a State office, claimed by Terry  The District Court refused the injunction, and the refusal was sustained by the Supreme Court.

Judge Labauve, who was the organ of the court, said : " It would require the strongest showing on the part of a private individual to induce a judge to enjoin a State officer from performing his functions ; and we are not prepared to say that it can be done in any circumstances.  The effect of such injunction would reflect upon and affect materially the government, and might stop, in certain cases, the government machinery.  Terry *v.* Stauffer, 17 A. R. 312.

This doctrine is adopted by the Federal Courts.  "The courts of the United States have no authority to enjoin the officers of the government against performing any act not merely ministerial."  See authorities quoted in Abbot's National Digest, *verbo* "Injunction," No. 48.

In New York it has been decided that the State courts have no power to restrain by injunction the acts of the officers of the State who are proceeding under the authority of the law, and that the fact of the statute in question being unconstitutional, forms no ground for granting the injunction.  Sedgwick Constitutional Law, p. 577.

But, if the plaintiff had any right to injunction, or to a *quo warranto*, it is not against the defendant that the writ should have issued, but against his principals.

In general, an injunction will not be allowed against an agent where the principal is not made a party.  Osborn *v.* Bank of the United States, 9 Wheaton's Reports, p. 739.

We think that it has already been abundantly proved that the plaintiff was not entitled to an injunction.

To complete their task, the undersigned counsel will review some points which do not appear in the pleadings, and were made, *ex proprio motu*, by the District Judge.  Case of interest, Mason 14.

The District Judge says :

"The next point to be examined is the alleged unconstitutionality of the act of the Legislature No. 1, entitled 'An act creating a Board of Police Commissioners,' and approved July 9, 1868.

"The position taken in the argument by defendant's counsel is that the court cannot pass upon the constitutionality of this law, because it does not possess the power to pass upon such questions when raised collaterally. I must confess the distinction attempted to be made between collateral and direct issues, as applicable to the present case, is too acute for my comprehension. It may be sound; and it may also be that my want of the proper capacity is the cause that I have not understood the application of the argument; but I acknowledge that I do not see any force, nor yet any application in the point."

The issue is no where presented in the pleadings, of the constitutionality of act No. 1, acts of 1868.

There is no prayer in the two petitions of the plaintiff, asking that this act should be decreed unconstitutional. The question did not even come incidentally before the court. In the argument of the defendant's counsel, it was stated that the twenty-sixth section of the city charter of 1856 was repealed by the said act No. 1, when the judge stopped the counsel and remarked to him that this act was unconstitutional; the counsel for the defendant replied immediately that this act No. 1 was on the statute book of Louisiana; that no judgment of any court had yet pronounced it to be unconstitutional, and until such a judgment the act must be respected and obeyed as the law of the land, and that the constitutionality of a law could not be inquired into incidentally, and when quoted in the argument of a case.

The judge seemed to be much surprised and astonished at the doctrines advanced by the counsel for the defendant and sarcastically remarked, "that the distinction attempted to be made between collateral and direct issues, as applicable to the present case, was too acute for his comprehension." (See Record, page 47.)

The counsel of the defendant conscious of the rectitude and the justness of the principles of constitutional law set down by them, was much more astonished than the learned judge, to hear the expression of any doubt about the soundness of the doctrine advocated by him, *Eh! Quoi! vous etes juge dans Israël, et vous ignorez ces choses!*

Can a party plead collaterally and incidentally that a law is unconstitutional?

In Kent's Commentaries, vol. 1, No. 450, note 1, we read:

Courts will not inquire collaterally into the constitutionality of legislative enactments. State *v.* Rich, 20 Mis. 393; Miller *v.* State, 3 Ohio St. 475.

In the case of Dorsey *v.* Vaughan, 5 A. R. 156, Vaughan as sheriff executed a writ of *fieri facias* against the property of Dorsey. Dorsey sued out an injunction, and as one of the grounds of the injunction alleged that Vaughan could not act as sheriff because in violation of the article 126 of the constitution of 1846. He held at the same time more than one civil office. The Supreme Court said:

"We do not recognize the right of the plaintiff to have the question of forfeiture of office determined in this mode of proceeding." See 5 A. R. 156.

The Supreme Court of New York decided—That the rule, that no court should declare a legislative act unconstitutional unless it is *glaringly* so, applies with peculiar force to the decision of a single judge, on a *collateral motion.* Abbott's New York Digest, vol. 7, p. 139, No. 2.

Notwithstanding these authorities which establish beyond a doubt the principle that a court cannot incidentally and collaterally pronounce a law to be unconstitutional, the District Judge proceeded to make himself the judge of the proceedings of the Legislature of 1868. He says—Record p. 50—

".The ground taken against the validity of the act of the ninth of July, 1868, is, that it was passed by the House of Representatives and Senate before the General Assembly had acted upon the proposed fourteenth amendment to the Constitution of the United States. This objection is derived from article one hundred and fifty-nine of our Constitution, which reads as follows: .

"'ART. 159. The General Assembly, .elected under this Constitution, shall hold its first session in the city of New Orleans on the third Monday after the official promulgation aforesaid, and proceed immediately upon its organization to vote upon the adoption of the fourteenth amendment to the Constitution of the United States, proposed by Congress, and passed June 13, 1866; said General Assembly shall not have power to enact any laws relative to the per diem of members, or any other subject, after organization, until said constitutional amendment shall have been acted upon.'

"By the journals of the House of Representatives, it appears that the fourteenth amendment was acted upon by the House on the first of July, 1868, having suspended the rules for that purpose. See journals House of Representatives, page 8. The same resolution ratifying the constitutional amendment was only finally acted upon by the Senate on the ninth of the same month; but before this, viz: on the second of July, the act No. 1, under discussion, was introduced in the House of Representatives, and passed on its first reading. Journal House of Representatives, page 10. And the third and final reading of this bill occurred on the fourth of July. See journal House of Representatives, page 14. Now it is plain that though on the second of July the House of Representatives had acted on the fourteenth amendment the Senate had not. The action required by article 159 of the Constitution is, that of the 'General Assembly;' and according to article 15 of the Constitution the 'General Assembly' consists of two distinct branches, the 'House' and the 'Senate.' It is a rule which 'is invariable upon such questions that the Legislature is presumed to have fulfilled the conditions necessary to invest it with legislative authority; but this presumption is completely rebutted when its own journals, besides proving the passage of a law, also establishes the non-fulfillment of the only condition upon the performance of which it had the power to enact the law. The act of the ninth of July, 1868, entitled 'An act creating a Board of Police Commissioners,' having been passed in violation of the one hundred and fifty-ninth article of the Constitution, is therefore null and void; and no repeal of the twenty-sixth section of the city charter, under the act of 1856, was effected thereby."

Taking for granted that the statement of the Judge is correctly copied from the journals of the House and Senate, we candidly assert that the Judge has drawn the most erroneous conclusion from his own premises. Far from showing any violation of the Constitution, this statement shows a most faithful and correct obedience to article 159 of the Constitution. The House first *passed* the resolution for the ratification of the fourteenth amendment and sent it to the Senate and proceeded to their ordinary business of legislation. No act of the Legislature could have any effect before the ratification of the fourteenth amendment.

The Senate concurred in the resolution ratifying the fourteenth amendment, and afterwards concurred in the act No. 1, sent from the House of Representatives, so the act No. 1 was enacted after the ratification of the fourteenth amendment by both houses. It is not claimed by the defendant that this act No. 1 was enacted or took effect before the ratification of the fourteenth amendment, but it is maintained that it was enacted after the ratification, as the journals will show. This act No. 1 is within the scope of legislative authority and therefore constitutional.

The article one hundred and fifty-nine of the Constitution did not

use the word *pass*, but used the word *enact*. There is a difference between these two *verbs*. To pass, conveys the meaning of proceeding or moving to the end of legislative action, which is the enactment. A law is said to pass when it is in progress from one house to another; when it has reached its final stage it is said that the law is enacted, and this seems to be the definition of Webster's Dictionary, *verbo enact* where this example is quoted from Mr. T. Bigelow: *Shall this bill pass to be enacted ?*

But there is a very serious objection to the conduct of the Judge. By what authority does he supervise the acts of one of the co-ordinate branches of the government? By so doing he himself violates the Constitution and usurps an authority which does not belong to him, he disobeys the precepts and doctrine settled by the Supreme Court, and we have no doubt that his usurpation will be discouraged by this Court.

In Nicholson *v.* Thompson, 5 R. R. 367, this Court said: The judicial department cannot supervise the acts of the co-ordinate branches of the government, it decides only on the rights of parties in controversy which have assumed a judicial form. 5 R. R. 367.

Neither the journal of the House nor of the Senate was offered in evidence. They are not legitimate evidence. If they had been offered, objection would have been made, and if received, a bill of exception would have been taken.

In the case of the People *v.* Devlin, 33 N. Y. Reports, p. 269, it was decided, " That the courts cannot examine the legislative journals or other evidence to ascertain parliamentary irregularities in the proceedings resulting in the passage of the act. If the act is constitutional and passed by a constitutional vote, legislative journals are not legitimate evidence to impeach it on the ground of irregularity or departure from parliamentary usage in the proceedings of the Legislature." Abbott's New York Digest, pages 262, 424, 425.

Whatever may be the irregularities or violations of the parliamentary rules when a bill has passed both branches of the Legislature and has been signed by the appropriate officers and sent to the Governor for his approval and signature, it has passed beyond the control of either house, and such a bill becomes the law of the State. Abbott's N. Y. Digest, vol. 7, pages 424 and 425.

The Supreme Court of Missouri sustained the same doctrine as the court of New York. The court said: " In our investigation, we have not met with a single case in which the courts have looked behind the statute roll in order to determine whether in passing a law the members of the Legislature conformed their conduct to the rules directed by the constitution, to be observed in framing laws." Pacific Railroad *v.* Governor, 23 Mo. 353.

See also the same doctrine maintained by the Supreme Court of Mississippi. 32 Mississippi Reports, p. 650.

The Supreme Court of Louisiana will no doubt maintain the same principles, and decree that the act number one, 1868, is constitutional, and this decree will annihilate at once the pretensions of Conway and Diamond.

HOWELL, J. The plaintiff, alleging that on the twenty-ninth October, 1863, he was duly appointed and commissioned as Chief of Police in and for the city of New Orleans by the Mayor thereof, whose authority so to do is derived from the city charter, and that the defendant, G. L. Cain, without legal authority and in violation of plaintiff's rights, claims and usurps the office and is pretending to perform the duties thereof to the injury of plaintiff, whose rights he refuses to recognize,

prayed for a writ of *quo warranto*, directing said Cain to show by what authority he holds, claims and usurps said office, and for a writ of injunction restraining him from interfering with plaintiff in the discharge of the duties of chief of police, with damages.

The writ of *quo warranto* was issued returnable on a day fixed and a rule to show at the same time why an injunction should not issue. Subsequently an amended petition was filed setting forth that said Cain was acting as chief of police of New Orleans by virtue of his appointment as "Superintendent of the Metropolitan Police," made pursuant to an act of the Legislature, entitled "An act to establish a Metropolitan Police District and to provide for the government of the same," approved fourteenth September, 1868; that his acts as such violates the vested rights of plaintiff as chief of police; that he usurps all the functions of said office under color of said appointment and refuses to plaintiff access to the records and office room of the chief of police of New Orleans to the injury of plaintiff and danger to the public peace; that the acts and doings of defendant violate the letter and spirit of the aforesaid act of the Legislature, which in no manner conflicts with the vested rights of plaintiff as chief of police under the city charter and ordinances; that said act violates articles 94, 117 and 118 of the Constitution of this State, and vests no rights in the defendant, and closing with the prayer of the original petition.

The defendant, without excepting to either petition, answered with a general denial and a special denial that plaintiff is chief of police or that any such office exists, or that the Mayor has any authority to make such appointment, and avers that plaintiff has no right to the writ of *quo warranto*, and his claim is in contempt of the laws of the State; that by divers acts of the Legislature the said office of chief of police has been abolished and the Mayor deprived of any power to appoint police officers; that on second November, 1863, he, plaintiff, was appointed superintendent *pro tempore*, and on ninth same month was duly elected and qualified superintendent of the "Metropolitan Police force," by the Board of Metropolitan Police, and he is now exercising the duties thereof; that the allegations of the petitions are untrue and insufficient for an injunction, which cannot issue to suspend the functions of executive officers, and upon presenting his warrant of appointment according to section seventeen of the act establishing the said Board, he prays that the petition be dismissed.

There being no evidence in the record, except the commissions of the parties with defendant's oath of office, the question involved is one of the construction and effect of the laws relating to the two offices and the functions thereof in controversy.

By the twenty-sixth section of the amended city charter (acts 1856, p. 142) the Mayor of New Orleans was empowered to appoint police officers, policemen and watchmen, under the ordinances of the common council organizing the same.

Article 133 of the Constitution of 1864 gave to the citizens of New Orleans the appointment of the officers necessary for the administration of the police of the city, in the mode prescribed by the Legislature, and directed that the city should maintain a police selected by the Mayor, and removable by a commission appointed by the Governor, recognizing in express terms a chief of police and other officers, and fixing the grade of their salaries.

Act No. 14 of the Legislature of 1866 directed that after the ensuing municipal election the police of the city should be organized by an ordinance determining the number, functions, etc., of the same; authorized the Mayor to make the appointments, and provided for carrying into effect the above article of the Constitution, fixing, among other things, the composition and functions of the police commission, which, with the Mayor *ex officio* a member thereof, had the control of the police of the city. None of the city ordinances are before us.

The Constitution of 1868 omitted article 133 of that of 1864, but by article 149 continued in force all legislation not inconsistent with the Constitution itself. This left the whole subject of the city corporation and police under the power and discretion of the Legislature, which by act No. 1, approved July 9, 1868, created a Board of Police Commissioners, to be appointed by the Governor, and who shall have "full power to appoint and remove and control the officers and men of the police force of the city of New Orleans;" directed how the officers and men should be removed, and repealed all acts and parts of acts inconsistent therewith. This act took effect from and after its passage, and as a consequence, the laws *authorizing the Mayor to appoint the police,* and creating a police commission, with the Mayor as a member, for the trial and removal of policemen, being inconsistent therewith, were repealed and all control of the police was taken from the Mayor and the said commission and vested in the board of five police commissioners, created by said act. No law exists authorizing the Mayor to make such appointment.

The plaintiff however asserts this act No. 1 to be unconstitutional, because by the one hundred and fifty-ninth article of the Constitution of 1868, it is provided that the General Assembly at its first session shall not have power to enact any law until the fourteenth amendment to the Constitution of the United States "*shall have been acted upon.*"

We have the highest evidence that said amendment had been "acted upon," when the said statute was passed, for the joint resolution ratifying it was approved on the same day with the statute. Both required alike the action of each house and to be submitted to the Governor before they took effect. The Constitution does not say that the proposed amendment shall be adopted before the General Assembly could propose or consider any bill—it only says that it shall not *enact* any laws, that is, pass any bill through the necessary stages to become a

law, until it had acted upon the amendment—the object being to secure early action thereon; and in our opinion the amendment was acted upon before any law was enacted in the constitutional sense. And we can see nothing in this statute in conflict with articles 42, 94, 117 and 118 of the Constitution, as charged.

The conclusion is evident that the Mayor was without legal authority to appoint plaintiff chief of police.

Subsequent legislation on the subject has, if possible, more effectually withdrawn and withheld the police of the city from the Mayor, (see acts Nos. 74 and 145 of 1868, and Nos. 60 and 92 of 1869); and the conclusion is manifest that the alleged appointment of the plaintiff as chief of police by the Mayor was without authority of law, and that in said capacity he has no right to the writ of *quo warranto* demanded in this proceeding.

It is not pretended that section 130 of the city charter, if in force, applies; and by act No. 156 of 1868, the party complaining must have an interest in the controversy and the proceeding must be in the name of the State.

Plaintiff having no interest in the office of chief of police or superintendent of the metropolitan police, cannot interfere with or restrain the defendant in the discharge of his alleged functions or question his right to the office, which plaintiff admits he holds under an " act to establish a metropolitan police district, and to provide for the government thereof," approved September 14, 1868.

Admitting that this act, in the particular features mentioned, is in conflict with the Constitution, it does not invalidate the establishment of a metropolitan police and the appointment of a superintendent thereof, as provided for in the act. It is said the act violates article 117, because the Lieutenant Governor is made *ex officio* the president of the board with a salary, and article 118, because the tax authorized is to be assessed upon the portion of the State comprising the metropolitan police district only, which, if true, as said before, does not render the balance of the act unconstitutional.

It is therefore ordered that the judgment appealed from be reversed and that there be judgment in favor of defendant dismissing plaintiff's demands with costs in both courts.