STATE OF NEBRASKA, EX REL. ATTORNEY GENERAL, V. FRANK E. MOORES ET AL.

FILED JUNE 23, 1898. No. 9855.

1. **Constitutional Law:** INVALID STATUTES: COURTS. To justify the courts in declaring a statute invalid it is not essential that it should contravene some express provision of the constitution. If the act is inhibited by the general scope and purpose of the fundamental law it is as invalid as though forbidden by the letter of that instrument.

2. ———: BILL OF RIGHTS: POWERS RESERVED. The bill of rights of our constitution is not an enumeration of all the powers reserved to the people of this state. A statute is unconstitutional and void which is repugnant to the rights, expressed or implied, retained by the people.

3. ———: MUNICIPAL CORPORATIONS: SELF-GOVERNMENT. The right of local self-government in cities and towns—*i. e.*, the power of the citizens thereof to govern themselves as to matters purely local in their nature, through officers of their own selection—existed in this state at the time the present constitution was framed, and was not surrendered upon the adoption of that instrument, but is vested in the people of the respective municipalities, and the legislature is powerless to take it away.

4. ———: ———: ———. The right to maintain a fire department in a city or town is one of the rights vested in the people of municipalities, and is to be exercised by them, without legislative interference, except to the extent the lawmaking body may prescribe rules to aid the people of the municipalities in the exercise of such right.

5. ———: ———: ———: FIRE AND POLICE COMMISSIONERS. The act of the legislature of 1897 (Session Laws 1897, ch. 10; Compiled Statutes, ch. 12*a*), in so far as it assumes to confer authority upon the governor to appoint fire and police commissioners in cities of the metropolitan class, is void, as being an unlawful attempt to deprive the people of such cities of the right of local self-government.

6. ———. *State v. Seavey*, 22 Neb. 454, overruled.

State v. Moores.

ORIGINAL action in the nature of quo warranto presenting to the supreme court the constitutionality of legislative enactments conferring upon the governor power to appoint four members of the board of fire and police commissioners of the city of Omaha. *Judgment of ouster against the governor's appointees.*

The facts and issues are stated in the opinions.

*C. J. Smyth, Attorney General,* and *Ed P. Smith, Deputy Attorney General,* for the state.

*McCoy & Olmsted,* for Peter W. Birkhauser and other appointees of the mayor of the city of Omaha:

The federal constitution guaranties to every state in the Union a republican form of government. A state with a different form of government could not be admitted. The right of local self-government is an essential element of republican government. Therefore it is not within the power of the legislature to prevent the people of the city of Omaha from selecting their own officers. (1 Curtis, History of Constitution pp. 183, 261; 2 Curtis, History of Constitution pp. 10, 470; Constitution 1866, art. 11, sec. 6; *Texas v. White,* 7 Wall. [U. S.] 700; *Penhallow v. Doane,* 3 Dal. [U. S.] 54; *Poindexter v. Greenhow,* 114 U. S. 270; *Hoke v. Henderson,* 4 Dev. [N. Car.] 1; *Allgeyer v. Louisiana,* 165 U. S. 578; *Ritchie v. People,* 155 Ill. 98; *Braceville Coal Co. v. People,* 147 Ill. 66; *Frorer v. People,* 141 Ill. 171; *Low v. Rees Printing Co.,* 41 Neb. 127; *State v. Julow,* 129 Mo. 163; *Chicago, B. & Q. R. Co. v. Chicago,* 166 U. S. 226; *Luther v. Borden,* 7 How. [U. S.] 42; *Penn v. Tollison,* 26 Ark. 545; *Calhoun v. Calhoun,* 2 S. Car. 283; *Texas v. White,* 7 Wall. [U. S.] 700; *White v. Hart,* 13 Wall. [U. S.] 649; *Blair v. Ridgely,* 41 Mo. 64; *Brittle v. People,* 2 Neb. 198.)

The statute interfering with the right of local self-government in the city of Omaha is a violation of the follow-

35

ing provision of the federal constitution: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (*Calhoun v. Calhoun*, 2 S. Car. 283; *Strauder v. West Virginia*, 100 U. S. 303.)

Local self-government is an inalienable right, whether wholly written, partly written, partly reserved, or wholly reserved. (Von Holst, Constitutional Law 331; 1 Barbour, Rights of Persons & Property 99; *Texas v. White*, 7 Wall. [U. S.] 700; *Rathbone v. Wirth*, 6 App. Div. [N. Y.] 277, 150 N. Y. 459; *Burch v. Newbury*, 10 N. Y. 374; *People v. Porter*, 90 N. Y. 68; *People v. Albertson*, 55 N. Y. 50; *People v. Draper*, 15 N. Y. 532; *State v. Denny*, 118 Ind. 382; *People v. Hurlbut*, 24 Mich. 44; *City of Evansville v. State*, 118 Ind. 427; *State v. Mayor*, 72 N. W. Rep. [Ia.] 639; *Attorney General v. City of Detroit*, 58 Mich. 213; *People v. Lynch*, 51 Cal. 15; *People v. Common Council of Detroit*, 28 Mich. 228.)

Police commissioners are local or civil officers. (Pomeroy, Constitutional Law [Bennett's ed.] pp. 595-597; *Ex parte Milligan*, 4 Wall. [U. S.] 2, 127; *Luther v. Borden*, 7 How. [U. S.] 1; *In re Debs*, 158 U. S. 564; *State v. Denny*, 118 Ind. 449.)

The state cannot levy a tax for local police protection, but the city must do so. (*Bradshaw v. City of Omaha*, 1 Neb. 16; *State v. Mayor*, 72 N. W. Rep. [Ia.] 639; *People v. Hastings*, 29 Cal. 449; *Cornell v. People*, 107 Ill. 372; *Lovingston v. Wider*, 53 Ill. 302.)

*W. J. Connell*, for the city of Omaha.

Points argued:

At the time of the Declaration of Independence the town and the county were the only municipalities known to our political history, and they possessed complete

powers of government in all local matters, legislative as well as executive.

Any diminution of the original complete governmental powers of the towns or the counties arose solely from the voluntary surrender of their rights for the purpose of combining under a common government which should be so constituted as to act as an agent for all in all matters of common interest. Powers not surrendered in the written constitutions remain with the people.

The right of local self-government is the possession of the individual citizen. It does not belong to states, nor to towns, counties, nor cities, but to the men who inhabit them, in which respect it differs from the similar right exercised by European municipalities prior to the revolution.

It is an inherent right. It is conferred by no sovereign power, and no sovereign power can take it away.

It is a common and an equal right. It belongs to every American citizen; and a state constitution which should preserve it to some of its citizens and take it away from others would not in that respect conform to the require-ments of a republican form of government.

It is a vital, substantial right, and no mere detail of government to be adopted or rejected at the will of the legislature.

Additional references: Cooley, Constitutional Limitations 3; *Robertson v. Baldwin*, 17 Sup. Ct. Rep. 327; *State v. Smith*, 14 Wis. 541; *State v. Van Beek*, 87 Ia. 577; *United States v. Ball*, 163 U. S. 662; *Brown v. Walker*, 161 U. S. 591; *Gandy v. State*, 13 Neb. 445; *Hanson v. Vernon*, 27 Ia. 73; *Police Commissioners v. Louisville*, 3 Bush [Ky.] 602; *Paducah v. Cully*, 9 Bush [Ky.] 325; *Buckner v. Gordon*, 81 Ky. 671; *Van Horn v. State*, 46 Neb. 62; *Henshaw v. Foster*, 9 Pick. [Mass.] 317; *People v. Draper*, 15 N. Y. 532; *Wilkinson v. Adam*, 1 Ves. & Bea. [Eng.] 466; 1 Story, Constitution 408; *Holmes v. Lansing*, 3 Johns. Cas. [N. Y.] 75; *Green v. Biddle*, 8 Wheat. [U. S.] 1; *Bronson v. Kinzie*, 1 How. [U. S.] 311; *Morse v. Goold*, 1 Kern. [N.

Y.] 281; 1 Dillon, Municipal Corporations [3d ed.] sec. 9; Cooley, Constitutional Limitations [5th ed.] 225; *People v. Mayor*, 51 Ill. 17.

*M. B. Reese*, for the mayor and council of the city of Omaha.

Points argued:

Legislative enactments attempting to confer upon the governor power to appoint members of the board of fire and police commissioners of the city of Omaha are unconstitutional and void.

It is not within the power of the legislature to take from the people of municipalities the right of local self-government.

Additional references: Black, Constitutional Law 8; Cooley, Constitutional Limitations [4th ed.] 44, 212, 228; *People v. Lothrop*, 24 Mich. 234; *Regents of the University of Maryland v. Williams*, 9 Gill & J. [Md.] 365; *Attorney General v. Common Council of Detroit*, 29 Mich. 108; Cooley, Principles of Constitutional Law 358; 1 Dillon, Municipal Corporations sec. 183.

Cases reviewed: *State v. Lancaster County*, 4 Neb. 537; *State v. Dodge County*, 10 Neb. 20; *Hanscom v. City of Omaha*, 11 Neb. 37; *State v. Ream*, 16 Neb. 681; *Shaw v. State*, 17 Neb. 334; *Magneau v. City of Fremont*, 30 Neb. 843; *Commonwealth v. McCloskey*, 2 Rawl. [Pa.] 368; *State v. Irey*, 42 Neb. 186; *Gillespie v. City of Lincoln*, 35 Neb. 34; *State v. Seavey*, 22 Neb. 454; *People v. Mahaney*, 13 Mich. 481; *State v. Covington*, 29 O. St. 102; *State v. Hunter*, 38 Kan. 578; *Commonwealth v. Plaisted*, 148 Mass. 375; *State v. Kolsem*, 29 N. E. Rep. [Ind.] 595; *Police Commissioners v. City of Louisville*, 3 Bush [Ky.] 597; *In Re Senate Bill*, 21 Pac. Rep. [Colo.] 481.

*E. R. Duffie, George A. Day*, and *I. J. Dunn*, for J. H. Peabody and other appointees of the governor:

The constitution is not a grant, but a limitation upon

the legislative power. The legislature may legislate upon any subject not inhibited by the constitution. (*Magneau v. City of Fremont*, 30 Neb. 843; *State v. Lancaster County*, 4 Neb. 537; *State v. Dodge County*, 8 Neb. 124; *Hanscom v. City of Omaha*, 11 Neb. 44; *State v. Ream*, 16 Neb. 685; *Shaw v. State*, 17 Neb. 334.)

A statute must stand or fall, as an expression of the will of the lawmaking power of the state, to whom the right to enact laws has been delegated by the people, and not upon the will or voice of any other body or power. (*Santo v. State*, 2 Ia. 165; *Geebrick v. State*, 5 Ia. 491; *State v. Beneke*, 9 Ia. 203; *Commonwealth v. McCloskey*, 2 Rawl. [Pa.] 368; *Philadelphia v. Fox*, 64 Pa. St. 169; *State v. Denny*, 118 Ind. 382; *State v. Irey*, 42 Neb. 189.)

Until some express provision of the constitution is claimed to be violated by legislative action there is nothing to call for judicial interpretation. (Cooley, Constitutional Limitations 153; *Walker v. City of Cincinnati*, 21 O. St. 14; *State v. McCann*, 21 O. St. 198; *Adams v. Howe*, 14 Mass. 340.)

Other references in an argument in favor of the constitutionality of the statute assailed: *Mayor of Baltimore v. State*, 15 Md. 376; *People v. Draper*, 25 Barb. [N. Y.] 366; 1 Dillon, Municipal Corporations [4th ed.] sec. 68 and note pp. 112, 113; *People v. Hurlbut*, 24 Mich. 44; *Burch v. Hardwicke*, 30 Gratt. [Va.] 24; *Gillespie v. City of Lincoln*, 35 Neb. 34; *Bryant v. City of St. Paul*, 33 Minn. 289; 1 Beach, Public Corporations sec. 744; *State v. Denny*, 118 Ind. 382, 449; *Bloomfield v. Charter Oak Bank*, 121 U. S. 121; *Town of Granby v. Thurston*, 23 Conn. 416; *Webster v. Town of Harwinton*, 32 Conn. 131; *Atwater v. Town of Woodbridge*, 6 Conn. 223; *McLoud v. Selby*, 10 Conn. 390; *Beardsley v. Smith*, 16 Conn. 368; *Chase v. Merrimack Bank*, 19 Pick. [Mass.] 564; *Gaskill v. Dudley*, 6 Met. [Mass.] 546; *Adams v. Wiscasset Bank*, 1 Greenl. [Me.] 361; *Fernald v. Lewis*, 6 Greenl. [Me.] 264; *Hopkins v. Town of Elmore*, 49 Vt. 176; *State v. Seavey*, 22 Neb. 454; *People v. Mahaney*, 13 Mich. 841; *Police Commissioners v. City of*

*Louisville*, 3 Bush [Ky.] 597; *People v. Draper*, 15 N. Y. 532; *Daley v. City of St. Paul*, 7 Minn. 390; *Mayor of Baltimore v. State*, 15 Md. 376; *Diamond v. Cain*, 21 La. Ann. 309; *State v. Covington*, 29 O. St. 102; *Burch v. Hardwicke*, 30 Gratt. [Va.] 24; *State v. Hunter*, 38 Kan. 578; *In re Senate Bill*, 21 Pac. Rep. [Colo.] 481; *Commonwealth v. Plaisted*, 148 Mass. 375; *State v. Kolsem*, 29 N. E. Rep. [Ind.] 595; *State v. Baltimore & O. R. Co.*, 12 Gill & J. [Md.] 399; *Regents of the University of Maryland v. Williams*, 9 Gill & J. [Md.] 397; Tiedeman, Limitations of Police Power sec. 1; *Davock v. Moore*, 63 N. W. Rep. [Mich.] 428; *People v. Tweed*, 63 N. Y. 202.

NORVAL, J., and RAGAN, C.

The legislature of this state at its session held in 1897 passed an act incorporating metropolitan cities and defining, prescribing, and regulating their duties, powers, and government. (Session Laws 1897, ch. 10; Compiled Statutes, ch. 12a.) Sections 166 and 167 of said act follow:

"Sec. 166. In each city of the metropolitan class, there shall be a board of fire and police commissioners, to consist of the mayor, who shall be ex officio chairman of the board, and four electors of the city who shall be appointed by the governor.

"Sec. 167. Immediately on the taking effect of this act, the governor shall appoint for each city governed by this act four commissioners, not more than two of whom shall be of the same political faith or party allegiance, one of whom shall be designated to serve until the first Monday of April 1898, and one to serve until the first Monday of April 1899, and one to serve until the first Monday of April 1900, and one to serve until the first Monday of April 1901, and on the last Tuesday in March in 1898, and on the same day in each year thereafter the governor shall appoint one commissioner in each city governed by this act, to take the place of the commissioner whose term of office expires on the first Monday

in April following such appointment, and those so appointed to succeed others shall serve for the term of four years following the first Monday in April after their appointment, except where appointments are made to fill vacancies, in which cases those appointed shall serve the remainder of term of the persons whose vacancies they are appointed to fill. Whenever a vacancy shall occur in any board of fire and police commissioners either by death, resignation, removal from the city, or any other cause, the governor shall appoint a commissioner to fill such vacancy."

Section 168 provides, *inter alia*: "No person shall be appointed a police commissioner who is engaged in the sale of malt, spirituous or vinous liquors, or who is engaged in the business of dealing in tobacco or articles manufactured therefrom, or who is an agent for any fire insurance company or companies or interested therein, or in the business of soliciting fire insurance, or who shall have been engaged in any of such callings or business within one year previous to the date of appointment."

Section 169 confers upon such board "all powers and duties connected with and incident to the appointment, removal, government, and discipline of the officers and members of the fire and police departments of the city." The board is empowered and required to appoint a chief of the fire department and such other officers of said department as may be deemed necessary, and to remove such officers, or any of them, whenever the board shall consider and declare such removal necessary for the proper management or discipline or for the more effective working or service of said department. The board is given power to employ all necessary firemen and assistants, and it is made its duty to appoint a chief of police, police matron, and such other officers and policemen that may be necessary to the extent that funds may be provided therefor by the mayor and council. All officers and police of the police department are subject to removal by the board of fire and police commissioners

under such rules and regulations as may be adopted by said board, whenever such removal becomes necessary for the proper management or discipline, or for the more effective working or service of the police department.

The respondents J. H. Peabody, D. D. Gregory, William C. Bullard, and R. E. L. Herdman were appointed by the governor under the provisions of said sections 166 and 167 as members of the board of fire and police commissioners for the city of Omaha, and the respondent Frank E. Moores is the mayor of said city, and by virtue of said act is made a member of said board and its chairman. The mayor and a majority of the councilmen of the city of Omaha, having assumed to exercise, control, and manage the fire and police departments of said city to the exclusion of any and all acts of the board appointed by the governor, an application by the state, on the relation of the attorney general, was filed in this court for a writ of quo warranto against the respondents named above and the members of the city council of Omaha to test the constitutionality of the sections of the said act of 1897 which attempted to confer upon the governor the power to appoint four members of the board of fire and police commissioners for each city of the metropolitan class. To this application the appointees of the executive answered setting up their respective appointments as members of said board and their subsequent qualification, and the mayor and council also filed answers alleging their right, power, and authority to provide for the appointment of the members of the board of fire and police commissioners of said city of Omaha to exercise, control, and manage the fire and police departments of said city and control and direct in all respects said departments, and that Peter W. Birkhauser, Charles J. Karbach, Matthew H. Collins, and Victor H. Coffman have been, under and in pursuance of an ordinance of the city of Omaha, appointed by the mayor of said city, and confirmed by a majority of the council thereof, as members of the board of fire and police commissioners

of said city and have qualified as such. The said appointees of the mayor and council have intervened and filed an answer and cross-application or information setting up their respective claims to the offices in question, and that the said act of 1897 is unconstitutional and void. The attorney general has filed a general demurrer to the answer of the respondents as well as to the answer and cross-application of the interveners, and the interveners have demurred to the answer of the governor's appointees. The cause has been submitted for judgment on said demurrers.

The validity of the law is assailed on the ground that it is violative of the inherent right of local self-government, by depriving the people of cities of the metropolitan class from choosing their own officers. There is no express provision in the constitution of this state which gives municipal corporations the power to select their officers or to manage their own affairs, nor is there any clause to be found in that instrument which in express terms inhibits the legislature from conferring upon the governor the power to appoint municipal officers to manage and control purely local affairs. If this act is invalid on the ground that the appointing power was placed in the hands of the governor, it is because the law is repugnant to some right retained by the people at the time of the adoption of the organic law. It is true the state constitution is not a grant of legislative power, and the lawmaking body may legislate upon any subject not inhibited by the fundamental law, as has been held in *Magneau v. City of Fremont*, 30 Neb. 843, and numerous other decisions of this court. But it by no means follows from this that the legislature is free to pass laws upon any subject, unless in express terms prohibited by the constitution. The inhibition on the power of the legislature may be by implication as well as by expression. Laws may be, and have been, declared invalid although not repugnant to any express restriction contained in the fundamental law.

In Von Holst, Constitutional Law, page 271, may be found this apposite language: "Congress has only the powers granted it by the federal constitution. The legislative power of the state legislatures, on the contrary, is unlimited as far as no limits are set to it by the federal or the state constitution. This does not mean, however, that these restrictions must always be expressed in explicit words. As it is generally admitted that the factors of the federal government have certain 'implied powers,' so it has never been disputed that the state legislatures are subject to 'implied restrictions,' that is, restrictions which must be deduced from certain provisions of the federal, or state constitution, or that arise from the political nature of the Union, from the genius of American public institutions," etc.

Judge Cooley, in his valuable work on Constitutional Limitations [5th ed.], page 203, uses this language: "It does not follow, however, that in every case the courts, before they can set aside a law as invalid, must be able to find in the constitution some specific inhibition which has been disregarded, or some express command which has been disobeyed. Prohibitions are only important where they are in the nature of exceptions to a general grant of power; and if the authority to do an act has not been granted by the sovereign to its representatives, it cannot be necessary to prohibit its being done."

In Mechem, Public Officers, section 123, it is said: "Indeed this right of local self-government, as it has been briefly termed, is held to be an established feature and incident of our political system, and it is not within the power of the legislature of a state to permanently fill by appointment the local offices established by law for purely local purposes."

In *Cincinnati, W. & Z. R. Co. v. Commissioners of Clinton County*, 1 O. St. 77, the court say: "But as the general assembly, like the other departments of government, exercise only delegated authority, it cannot be doubted that any act passed by it, not falling fairly within the scope

of legislative power, is as clearly void as though expressly prohibited. And we agree, entirely, with the supreme court of Pennsylvania in *Parker v. Commonwealth*, 6 Barr 511, that 'it is this species of insidious infraction that is more to be feared and guarded against than direct attacks upon any particular principle proclaimed as a part of the primordial law; for attempts of the latter description will, generally, be met by instant reprobation, while the stealthy and frequently seductive character of the former is apt to escape detection, until the innovation is made manifest by the infliction of some startling wrong.' It is not my purpose to point out the numerous cases in which a legislative act might be avoided as transcending the limits of the powers delegated to that body, although not expressly prohibited. The attempted exercise of executive or judicial power, delegated to the other departments, will very readily suggest many instances, while many others may be easily imagined, of encroachments upon reserved rights, not surrendered to any department of the government. From these considerations it follows that it is always legitimate to insist that any legislative enactment, drawn in question, is void either because it does not fall within the general grant of power to that body, or because it is expressly prohibited by some provision of the constitution."

In *People v. Albertson*, 55 N. Y. 50, it was said: "A written constitution must be interpreted and effect given to it as the paramount law of the land, equally obligatory upon the legislature as upon other departments of government and individual citizens, according to its spirit and the intent of its framers, as indicated by its terms. An act violating the true intent and meaning of the instrument, although not within the letter, is as much within the purview and effect of a prohibition as if within the strict letter; and an act in evasion of the terms of the constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessa-

rily implied purposes, is as clearly void as if in express terms forbidden. A thing within the intent of a constitution or statutory enactment is, for all purposes, to be regarded as within the words and terms of the law. A written constitution would be of little avail as a practical and useful restraint upon the different departments of government if a literal reading only was to be given it, to the exclusion of all necessary implication, and the clear intent ignored and slight evasions or acts, palpably in evasion of its spirit, should be sustained as not repugnant to it."

Justice O'Brien in *Rathbone v. Wirth*, 150 N. Y. 459, uses this language: "When the validity of such legislation is brought in question it is not necessary to show that it falls appropriately within some express written prohibition contained in the constitution. The implied restraints of the constitution upon legislative power may be as effectual for its condemnation as the written words, and such restraints may be found either in the language employed, or in the evident purpose which was in view, and the circumstances and historical events which led to the enactment of the particular provision as a part of the organic law."

In *People v. Morris*, 13 Wend. [N. Y.] 325, Justice Nelson said: "The only limitation to the powers of the legislative department that can exist must be found either in the constitution of the United States or of this state, or in the natural and inherent rights of the citizens, which they cannot part with or be deprived of by the society to which they belong. The latter qualification is undefined, and perhaps undefinable by any general code, having a just regard to the security of these rights. Some of the constitutions of the states contain a declaration of these powers, and some also declare (and all are no doubt so to be understood) that the enumeration shall not be construed as denying or impairing others retained by the people. We have no bill of rights; though many of the principles usually found in such instruments are incor-

porated in the provisions of the constitution. The enumeration was designedly omitted, because unnecessary and tended to weaken, if not endanger, those unnoticed. The limitation or qualification in this respect must depend upon the enlightened wisdom and discretion of the legislature, and the decisions of the judicial department."

In *Rathbone v. Wirth*, 6 Hun [N. Y.] 277, Judge Herrick, speaking of the legislature, observed: " 'It has the power, subject to the qualified negative of the governor, to pass any law which it may deem necessary for the public good, not inconsistent with the first principles of government, nor contrary to the provisions of the constitution of this state or the United States.' (*Burch v. Newbury*, 10 N. Y. 374-392.) And in interpreting the power of the legislature under the constitution we are not confined to the strict letter of that instrument, or compelled to point out the exact article, section, clause, or phrase therein which grants or denies the power in question. There are some things so contrary to the entire purpose and spirit of the constitution that they must be said to be in conflict with it, although it cannot be contrasted with any specific portion of it. The object of its adoption, and its purpose and intent taken as a whole, must be considered. * * * What has been called 'the political tendency of the constitution' may be considered in interpreting it. (*People v. Porter*, 90 N. Y. 75.) The full measure and intent of the instrument is not always to be found in its mere letter. To again quote Justice Cooley: 'If we may suppose for an illustration that the legislature shall provide that, in Detroit, any single person may be chosen, in whom may be vested the whole legislative authority of the city, and all other authority pertaining to local government of every description and nature, not expressly by the constitution confided to officers specified, it would require unusual boldness in any one who should undertake to defend such a local dictatorship as something within the competency of legislation under a constitution avowedly

framed to guard, protect, and defend the local powers and local liberties.' (*People v. City of Detroit*, 28 Mich. 228.) To put another illustration. Under the last clause of section 2 of article 10 of the constitution, all offices not in existence at the adoption of the constitution, but that shall thereafter be created by the legislature, may be filled by officers elected by the people, or appointed, as the legislature may direct. Suppose the legislature should see fit to create a new county office, and should provide that, at the general election for the election of state officers, the person for whom the next higher number of ballots should be cast for such office should thereafter discharge the duties thereof. A new office is created, which the legislature has a right to create, and also to determine the method of filling it. There is nowhere any express prohibition against legislation of that character in the constitution, and yet what man will say that an act of that kind will stand for a moment, not because it is in conflict with an express provision of the constitution, but because it is repugnant to its whole spirit and intent. * * * The supreme power of the people does not arise from the constitution or exist by virtue of it; it existed prior to it; it makes and unmakes constitutions, but is not made by them; consequently, we are not to look into the constitution for any grant of power to the people, or any definition of their powers; they possess all that they have not surrendered by the constitution. One of the primary purposes for the adoption of a written constitution is the protection of minorities and individuals from the exercise of absolute power. For that purpose the people have yielded up some of their powers, but they retain all that they have not restricted themselves from exercising, by the express words of the constitution or by necessary implication therefrom."

The legislature of Ohio enacted that certain cities of that state should have a board of police commissioners to be elected by the voters of the municipality, but that

no elector should vote at an election for more than two persons for such commissioners, and the four persons receiving the highest number of votes cast should be declared elected. In *State v. Constantine*, 42 O. St. 437, it was held that the provision which denied to an elector the right to vote for all the members of the police board was unconstitutional, although the constitution merely provided that each elector shall be entitled to vote at all elections. The court say: "This implication fairly arises from the language of the constitution itself, but is made absolutely certain when viewed in the light of circumstances existing at the time of its adoption. No such thing as 'minority representation' or 'cumulative voting' was known in the policy of this state at the time of the adopted of this constitution in 1851. The right of each elector to vote for a candidate for each office to be filled at an election has never been doubted. No effort was made by the framers of the constitution to modify this right, and we think it was intended to continue and guaranty such right by the provision that each elector 'shall be entitled to vote at all elections.' " (See *Maynard v. District Canvassers*, 84 Mich. 228.)

This court in *Low v. Rees Printing Co.*, 41 Neb. 127, held the act known as the eight hour law invalid on the ground that it denied the right of parties to contract with reference to compensation for services, although no express constitutional provision guarantied to the individual the right to contract as he pleased. The law was also held bad as class legislation, but the decision was placed as squarely upon the other ground.

In *West Point Water Power & Land Improvement Co. v. State*, 49 Neb. 218, it was ruled that the reserved powers of the state are inalienable and cannot be surrendered or taken away by the legislature.

The first article of our state constitution expressly enumerates certain rights which the people have reserved to themselves, and manifestly any law passed in violation of such reserved rights would be declared by the

courts unconstitutional. It cannot be successfully asserted that the only rights reserved to the people are those enumerated in said article of the constitution, since section 26 thereof declares: "This enumeration of rights shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people." This language removes all doubt that powers other than those specified in the bill of rights were retained by the people, and any statute enacted in violation of such rights is as clearly invalid as though the same had been expressly forbidden by the fundamental law. Suppose a statute should be enacted providing that a candidate who receives the smallest number of votes for a public office shall be declared elected thereto. Could it be doubted that such a law would be unconstitutional, notwithstanding it is not in conflict with any express provision of the constitution? We think not. The right of the majority to govern is as much reserved to the people as though such right had been in apt language expressed in the constitution.

The important question, therefore, is whether the right of the people of municipal corporations to choose their own local officers is one of the powers retained by the people which the legislature cannot take away. An examination of the various provisions of our constitution fails to show that the right is conferred upon the legislature or any other department of state government in direct, explicit, and plain language, or impliedly, to deprive municipal corporations of the power to govern themselves by officers of their own selection. On the contrary, it is very evident that the constitution was framed upon the theory of local self-government—the right of the people to determine in and for themselves who shall be their officers. It has provided that state and county officers shall be chosen by the people, and the legislation in this state prior to the adoption of the constitution has invariably recognized the principle of local self-government. The several charters of cities and towns existing

when the present constitution was adopted provided for the selection of municipal officers by the citizens of the municipalities, and it was in 1887 when the legislature of this state first attempted to deprive municipal corporations of the power to choose their local officers. The right of local self-government is not forbidden by the constitution, while the principle is fully recognized in that instrument, and its framers must have contemplated that the right then existing of municipal corporations to choose their local officers to administer their local affairs should continue as in the past. This right still exists, and the legislature is powerless to abridge the same, or take it away.

In *Rathbone v. Wirth*, 6 Hun [N. Y.] 277, we find this discussion of the right of local self-government: "Under our form of government that supreme power is vested in and exercised by the majority, and for all practical purposes the majority are the people. The principle that the majority shall govern lies at the very basis of our government. Among the rights of the majority, as a part of its sovereign power, is the right to select officers, either directly by election, or indirectly by authorities or officers whom they have chosen by election.  *  *  *  This power of the majority to govern, the legislature cannot take from them. The legislature exercises the legislative power of the people. It is their agent for that purpose; but it cannot limit or surrender any of the power or authority of its principles. But it may be said the legislature is composed of the representatives of the people, and that, therefore, their acts are presumed to be the acts of a majority of the people, and that while this act deprives the majority of the people in one locality of their power, still it is in accordance with the will of the majority of the people of the whole state, and that thereby the principle of majority government is recognized. There would be force in that suggestion if it was not for another principle of our government recognized by our constitution, and if the people had not by the constitu-

36

tion limited their power to override the will of a majority in any locality. The principle I refer to is the principle of local self-government. * * * Local self-government is the school which fits people for self-government. Local self-government is the result, and also the most efficient preserver of civil liberty. * * * The principle is one that runs through our entire system of government, from the road and school district up to the federal government. * * * Without further continuing this branch of the discussion, suffice it to say that, in my opinion, the purpose of the bill is obnoxious to the constitution, as an infringement upon the right of the majority to select their own officers, either immediately by election or by their accredited agents, and as destructive of the principle of local self-government."

In *Rathbone v. Wirth*, 150 N. Y. 459, Mr. Justice Gray, in delivering the opinion of the court, said: "I refer to the right of local self-government,—a right which inheres in a republican government, and with reference to which our constitution was framed. The habit of local self-government is something which we took over, or rather continued from, the English system of government, and, as Judge Cooley has remarked with reference to the constitutions of the states, 'if not expressly recognized, it is still to be understood that all of these instruments are framed with its present existence and anticipated continuance in view' (Cooley, Constitutional Limitations 35). The principle is one which takes but little reflection to convince the mind of being fundamental in our governmental system and as contributing strength to the national life, in its educational and formative effect upon the citizen. It means that in the local, or political, subdivisions of the state the people of the locality shall administer their own local affairs to the extent that that right is not restricted by some constitutional provision. I do not think that it can be seriously disputed that the conception of the state is free from the element that it belongs to it to control purely local affairs, and that state

interference finds justification only when state policy, or local abuses, demand it. I think that no inference is warranted that other powers have been conferred by the people upon their legislative body than those which are mentioned in the constitution, or which are necessary to carry into effect those which are expressly given. * * * 'The theory of the constitution is, that the several counties, cities, towns, and villages are, of right, entitled to choose whom they will have to rule over them; and that this right cannot be taken from them and the electors and inhabitants disfranchised by any act of the legislature, or of any or all of the departments of the state government combined. This right of self-government lies at the foundation of our institutions and cannot be disturbed or interfered with, even in respect to the smallest of the divisions into which the state is divided for governmental purposes, without weakening the entire foundation; and hence it is a right not only to be carefully guarded by every department of the government, but every infraction or evasion of it to be promptly met and condemned; especially by the courts when such acts become the subject of judicial investigation.' This is strong and significant language. Read in its light, the provision of the act under consideration appears as legislation hostile to that freedom of action which the people of Albany have the right to claim, under the constitution, in the management of their own affairs."

In *People v. Hurlbut*, 24 Mich. 44, 79, there was involved the validity of an act of the legislature creating a board of public works in the city of Detroit, and providing for the appointment of the officers or members of the board by the legislature. Section 14, article 15, of the constitution of Michigan declares: "Judicial officers of cities and villages shall be elected, and all other officers shall be elected or appointed at such time and in such manner as the legislature shall direct." The law was held invalid, and that permanent appointments for purposes solely municipal can be made alone by municipal author-

ity. Campbell, C. J., in his opinion said: "In the litiga-
tion now before us there is no acquiescence by the city in
the choice of the board of works, or in any part of the
legislative action on the subject. We are, therefore, com-
pelled to consider the plain question, whether the state
authorities have a right to assume unlimited control of
all municipal appointments. Judicial offices the con-
stitution has distinctly provided for as elective; and
they are local in their action rather than in their nature.
But as to other offices the power is plenary, or it does
not exist at all. It may as well include every office as
any less than all. It may put all the power into the
hands of one person as well as divide it among several,
and it may continue it for life as well as for a less period.
Life tenure is not rare in municipal offices. The alder-
men of London, and probably of many other cities, hold
for life. It may create incorporated cities and villages,
in such numbers as to put the great mass of local admin-
istration in the hands of state agents. This is not very
likely to happen, but it is just as likely as many other
things which it has been thought proper to guard against
by constitutional enactment. It is, beyond dispute, di-
rectly opposed to the principal design of all our constitu-
tions, and if it has not been guarded against there has
been a very great oversight, and the present legislation
shows that the danger was not imaginary. But the con-
stitution is not fairly open to such criticism. We must
never forget, in studying its terms, that most of them
had a settled meaning before its adoption. Instead of
being the source of our laws and liberties, it is, in the
main, no more than a recognition and re-enactment of an
accepted system. The rights preserved are ancient
rights, and the municipal bodies recognized in it, and
required to be perpetuated, were already existing, with
known elements and functions. They were not towns or
counties or cities or villages, in the abstract—or munici-
palities which had lost all their old liberties by central
usurpation—but American and Michigan municipalities

of common-law origin, and having no less than common-law franchises.   *   *   *   Our constitution cannot be understood or carried out at all, except on the theory of local self-government; and the intention to preserve it is quite apparent.  In every case where provision is made by the constitution itself for local officers they are selected by local action.   *   *   *   It is impossible to read that document without finding the plainest evidence that every part of the state is to be under some system of localized authority emanating from the people.  This is no mere political theory, but appears in the constitution as the foundation of all our polity.  There is no middle ground.  A city has no constitutional safeguards for its people, or it has the right to have all its officers appointed at home.  Unless this power is exclusive, the state may manage all city affairs by its own functionaries.  The only reasonable meaning of the constitutional clause in question is, that when the legislature has designated the time and manner of appointment or election, the local authority shall fill the offices as so ordained."

Cooley, J., delivered a separate concurring opinion in the same case so full of sound reason and common sense that we have taken copious excerpts therefrom.  He said: "We have before us a legislative act creating for the city of Detroit a new board, which is to exercise a considerable share of the authority usually possessed by officers locally chosen; to have general charge of the city buildings, property, and local conveniences; to make contracts for public works on behalf of the city, and to do many things of a legislative character which generally the common council of cities alone is authorized to do. The legislature has created this board, and it has appointed its members; and both the one and the other have been done under a claim of right which, unless I wholly misunderstand it, would justify that body in taking to itself the entire and exclusive government of the city, and the appointment of all its officers, excepting only the judicial, for which, by the constitution, other

provision is expressly made. And the question, broadly and nakedly stated, can be nothing short of this: Whether local self-government in this state is or is not a mere privilege conceded by the legislature in its discretion, and which may be withdrawn at any time at pleasure? I state the question thus broadly because, notwithstanding the able arguments made in this case, and after mature deliberation, I can conceive of no argument in support of the legislative authority which will stop short of this plenary and sovereign right.    *    *    * The doctrine that within any general grant of legislative power by the constitution there can be found authority thus to take from the people the management of their local concerns, and the choice, directly or indirectly, of their local officers, if practically asserted, would be somewhat startling to our people, and would be likely to lead hereafter to a more careful scrutiny of the charters of government framed by them, lest sometime, by inadvertent use of words, they might be found to have conferred upon some agency of their own the legal authority to take away their liberties altogether. If we look into the several state constitutions to see what verbal restrictions have heretofore been placed upon legislative authority in this regard, we shall find them very few and simple. We have taken great pains to surround the life, liberty, and property of the individual with guaranties, but we have not, as a general thing, guarded local government with similar protections. We must assume either an intention that the legislative control should be constant and absolute, or, on the other hand, that there are certain fundamental principles in our general framework of government which are within the contemplation of the people when they agree upon the written charter, subject to which the delegations of authority to the several departments of government have been made. That this last is the case appears to me too plain for serious controversy. The implied restrictions upon the power of the legislature, as regards local government,

though their limits may not be so plainly defined as ex-
press provisions might have made them, are nevertheless
equally imperative in character, and whenever we find
ourselves clearly within them, we have no alternative
but to bow to their authority. The constitution has been
framed with these restrictions in view, and we should
fall into the grossest absurdities if we undertook to con-
strue that instrument on a critical examination of the
terms employed, while shutting our eyes to all other con-
siderations. The circumstances from which these impli-
cations arise are: First, that the constitution has been
adopted in view of a system of local government, well
understood and tolerably uniform in character, existing
from the very earliest settlement of the country, never
for a moment suspended or displaced, and the continued
existence of which is assumed; and, second, that the lib-
erties of the people have generally been supposed to
spring from, and be dependent upon, that system. * * *
Our traditions, practice, and expectations have all been
in one direction. And when we go beyond the general
view to inquire into the details of authority, we find that
it has included the power to choose in some form the
persons who are to administer the local regulations. In-
stances to the contrary, except where the power to be
administered was properly a state power, have been
purely exceptional. * * * In view of these historical
facts, and of these general principles, the question recurs
whether our state constitution can be so construed as to
confer upon the legislature the power to appoint for the
municipalities the officers who are to manage the prop-
erty, interests, and rights in which their own people
alone are concerned. If it can be, it involves these con-
sequences: As there is no provision requiring the legis-
lative interference to be upon any general system, it can
and may be partial and purely arbitrary. As there is
nothing requiring the persons appointed to be citizens
of the locality, they can and may be sent in from abroad,
and it is not a remote possibility that self-government

of towns may make way for a government by such influences as can force themselves upon the legislative notice at Lansing. As the municipal corporation will have no control, except such as the state may voluntarily give it, as regards the taxes to be levied, the buildings to be constructed, the pavements to be laid, and the conveniences to be supplied, it is inevitable that parties, from mere personal considerations, shall seek the offices, and endeavor to secure from the appointing body, whose members in general are not to feel the burden, a compensation such as would not be awarded by the people, who must bear it, though the chief tie binding them to the interests of the people governed might be the salaries paid on the one side and drawn on the other. As the legislature could not be compelled to regard the local political sentiment in their choice, and would, in fact, be most likely to interfere when that sentiment was adverse to their own, the government of cities might be taken to itself by the party for the time being in power, and municipal governments might easily and naturally become the spoils of party, as state and national offices unfortunately are now. All these things are not only possible, but entirely within the range of probability, if the positions assumed on behalf of the state are tenable. It may be said that these would be mere abuses of power, such as may creep in under any system of constitutional freedom; but what is constitutional freedom? Has the administration of equal laws by magistrates freely chosen no necessary place in it? Constitutional freedom certainly does not consist in exemption from governmental interference in the citizen's private affairs; in his being unmolested in his family, suffered to buy, sell, and enjoy property, and generally to seek happiness in his own way. All this might be permitted by the most arbitrary ruler, even though he allowed his subjects no degree of political liberty. The government of an oligarchy may be as just, as regardful of private rights, and as little burdensome as any other; but if it were sought to establish

such a government over our cities by law, it would hardly do to call upon a protesting people to show where in the constitution the power to establish it was prohibited; it would be necessary, on the other hand, to point out to them where and by what unguarded words the power had been conferred. Some things are too plain to be written. If this charter of state government, which we call a constitution, were all there was of constitutional command; if the usages, the customs, the maxims, that have sprung from the habits of life, modes of thought, methods of trying facts by the neighborhood, and mutual responsibility in neighborhood interests, the precepts which have come from the revolutions which overturned tyrannies, the sentiments of manly independence and self-control which impelled our ancestors to summon the local communities to redress local evils, instead of relying upon king or legislature at a distance to do so;—if a recognition of all these were to be stricken from the body of our constitutional law, a lifeless skeleton might remain, but the living spirit, that which gives it force and attraction, which makes it valuable and draws to it the affections of the people, that which distinguishes it from the numberless constitutions, so called, which in Europe have been set up and thrown down within the last hundred years, many of which, in their expressions, have seemed equally fair and to possess equal promise with ours, and have only been wanting in the support and vitality which these alone can give—this living and breathing spirit, which supplies the interpretation of the words of the written charter, would be utterly lost and gone.  *  *  *  The state may mould local institutions according to its views of policy or expediency; but local government is matter of absolute right, and the state cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the state not only shaped its government, but at discre-tion sent in its own agents to administer it; or to call that system one of constitutional freedom under which

it should be equally admissible to allow the people full
control in their local affairs, or no control at all.  What
I say here is with the utmost respect and deference
to the legislative department, even though the task I
am called upon to perform is to give reasons why a blow
aimed at the foundation of our structure of liberty should
be warded off."

The same doctrine was recognized and applied by the
same court in *People v. Common Council of Detroit*, 28 Mich.
228.  In that case there was under consideration a stat-
ute relative to a public park for the city of Detroit, which
created a board of park commissioners and designated
six citizens of Detroit as the first members of such board.
The act was held invalid because the selection of the park
commissioners by the legislature was repugnant to the in-
herent right of local self-government.  The constitutional
right of municipal self-government was sustained in *At-
torney General v. Common Council of Detroit*, 29 Mich. 108;
*Commissioners of Parks v. Detroit*, 80 Mich. 663; *Hubbard
v. Township Board of Springwells*, 25 Mich. 153; *Allor v.
Auditors of Wayne County*, 43 Mich. 76; *Attorney General
v. Detroit Common Council*, 58 Mich. 213.

By an act of the legislature of Michigan the governor
was empowered to appoint three commissioners to im-
prove a certain highway and levy the expenses on adja-
cent lands.  The law was declared invalid in *Hubbard v.
Township Board of Springwell*, 25 Mich. 153, as inimical
to the fundamental theory of self-government.

In Michigan there existed a statute making it the duty
of the governor, by appointment, to fill any vacancy in a
county office for and during the unexpired portion of the
regular term limited to such officer, and in pursuance of
said enactment the governor appointed one George C.
Lawrence as auditor for the county of Wayne, in the
place of William C. Mahoney, deceased.  Proceedings in
the nature of quo warranto by the attorney general on
the relation of said Lawrence was instituted in the su-
preme court to test the right of the latter to said office

of county auditor. The validity of the law under which Lawrence was appointed was assailed, and the court said the statute which gave the governor power to fill vacancies in county offices was invalid, since it deprived the electors of the county of the right to choose their own officers. (*Attorney General v. Trombly*, 89 Mich. 50.) McGrath, J., speaking for the court, said: "No question is raised as to the legality of his appointment, but respondent insists that the act of 1857 is unconstitutional as abridging the right of local self-government; that the governor's authority under the act of 1873 is limited by implication to provisional appointments, and that the electors of Wayne county had the right to fill the vacancy at the next or at any subsequent general election after such vacancy occurred. While the constitution contains no express verbal restrictions upon the power of the legislature to authorize the governor to make permanent appointments to purely local offices, the principle of local self-government is so deeply imbedded in the groundwork of our system of government that no mere general grant of legislative power can be said to include the authority to take from the people the management of their local concerns, and all delegations of authority to the several departments of government must be deemed to have been made subject to this fundamental principle. This is but the restatement of the doctrine laid down by Justice Cooley, after an able and exhaustive discussion of the question, participated in by all members of the court, in *People v. Hurlbut*, 24 Mich. 44." Judge McGrath, after stating that the correctness of the doctrine enunciated in *People v. Hurlbut*, *supra*, has not been since questioned but approved in numerous cases which he cites, said: "The act of 1857 is therefore invalid, as the legislature cannot divest the people of the county of Wayne of the right to select their own officers in the usual manner."

The Michigan cases referred to in this opinion are in point here, as they were decided under a constitution

like our own, which contains no express provision limiting the power of the legislature to authorize the governor to appoint purely local officers. The supreme court of Michigan steadfastly denied the power of the legislature to deprive municipal corporations of the right of local self-government, although in *People v. Mahaney*, 13 Mich. 481, that court, in harmony with the principle announced by many courts, approved a law authorizing the selection by the governor of police commissioners for cities, recognizing a distinction between officers whose duties are purely of a local character and officers chosen for a particular city or town whose duties are of a public or general nature, and which concern the state or general public. The former class the legislature may not empower the governor to appoint, while such authority may be conferred upon the executive as to the officers belonging to the latter class.

The legislature of the state of Indiana passed a law (Acts 1889, p. 247) purporting to give control of the streets, alleys, sewers, lights, water supply, etc., in cities containing more than fifty thousand inhabitants to boards of public works appointed by the legislature for residents of the cities affected. This act was under consideration in *State v. Denny*, 118 Ind. 382, and held to be void as denying the right of local self-government, although the law contravened no express provision of the constitution of that state. That decision is planted squarely upon the proposition that the right of the people to govern themselves as to matters purely local in their nature, through the medium of local municipal officers of their own choosing, was not curtailed by the adoption of the constitution, but is still vested in them, and the legislature is powerless to take such right away. Coffey, J., in delivering the opinion of the court, observed: "It is perhaps true that the general assembly may, at will, pass laws regulating the government of towns and cities, taking from them powers which had previously been granted, or adding to that which had previously

been given, but we do not think that it can take away
from the people of a town or city rights which they pos-
sessed as citizens of the state before their incorporation.
The object of granting to the people of a city municipal
powers is to give them additional rights and powers to
better enable them to govern themselves, and not to take
away any rights they possessed before such grant was
made. It may be true, that as to such matters as the
state has a peculiar interest in, different from that relat-
ing to other communities, it may, by proper legislative
action, take control of such interest; but as to such mat-
ters as are purely local, and concern only the people of
that community, they have the right to control them,
subject only to the general laws of the state, which affect
all the people of the state alike. The construction of
sewers in a city, the supply of gas, water, fire protection,
and many other matters that might be mentioned, are
matters in which the local community alone is concerned
and in which the state has no special interest more than
it has in the health and prosperity of the people gener-
ally, and they are matters over which the people affected
thereby have the exclusive control, and it cannot, in our
opinion, be taken away from them by the legislature."
In the same opinion, after speaking of the duties and
powers conferred upon the three members of the board
provided for by the act, this language is employed: "If
the legislature may put these matters in the hands of
three men, why not in the hands of one man? And if they
may transfer these matters, why may they not transfer
others? In other words, the effort is by this act to take
from the city all control over the improvements of the
city, without the consent of her people, and place it in
the hands of the agents of the state chosen by the leg-
islature, and charge the people of the city with the whole
expense. We do not think that the people have conferred
upon the legislature any such power. It is subversive
of all local self-government, a right that the people did
not surrender when they adopted the constitution. They

still retained, after the adoption of that instrument, the right to select their own local officers, and every effort to deprive them of such right must be held to be beyond the power of the legislature. In our opinion, the entire act, attempting to create a board of public works and affairs for cities having a population of fifty thousand or more, is in conflict with the constitution and is void."

Elliot, C. J., in a separate concurring opinion in the same case, said: "The right to choose officers is primarily and inherently in the people. Primarily it is neither an executive nor a legislative function. Except as expressly or impliedly delegated to the executive or the legislative department, it resides entirely in the electors of the state. Silence on the subject takes no part of the power from the people, and vests none in their representatives. (*State v. Johns*, 3 Ore. 533; *People v. Bull*, 46 N. Y. 57; *Speed v. Crawford*, 3 Met. [Ky.] 207.) * * * I do not deny that the legislature has the power to change the form and mode in which municipal corporations shall be governed; on the contrary, I affirm that without the consent of the inhabitants the form of the corporate government may at any time be altered, but I do deny that the legislature has the power to deprive the electors of a municipal corporation of the right to choose their own immediate local officers. By immediate local officers I mean such as are charged with the control of purely local concerns, as the streets, the fire apparatus, and the like matters. In the class of local officer I do not include the peace-keeping officers, or the constabulary, for such officers are, in reality, officers of the state, as it is the duty of the state to provide for the personal safety of its citizens on the thronged streets of a great city as well as on the secluded rural highways. What I affirm, in short, is this, that because an elector lives in a city he cannot have the right to vote upon purely local affairs taken from him by any statute. The decisions which declare that the state may appoint peace officers in cities can be sustained only upon the ground that

such officers are state officers and not local officers. The principle is one not to be extended, but to be limited."

The precise question now before us has been determined by the supreme court of Indiana in able and exhaustive opinions in *City of Evansville v. State*, 118 Ind. 426, and *State v. Denny*, 118 Ind. 449. In both of those cases there was under consideration an act creating a metropolitan police and fire board in cities having a certain population, providing for the appointment of the commissioners or members of said board by the legislature, and giving them full control and power over the police and fire departments of such cities and property and records belonging to said departments. The act was assailed as being unconstitutional on various grounds, among others, that it deprived the people of the cities coming within the provisions of the law of the right of local self-government. The invalidity of the law was declared on that ground. Berkshire, J., in delivering the opinion of the court in the first case, uses this language: "The commissioners who compose the board are not the officers or representatives of the city, for it has no part in their selection, and no control over their actions; they are appointed by the legislature and derive all authority from that high power. They are, therefore, the officers and representatives of the state, and not of the city. But, under the law, all expenses of whatever kind, relating to these departments, the city has to pay. * * * If the act related alone to the management of the police department, and the state was proposing to take upon itself the burden of maintaining the department as well as its management, or if it were made to appear that the city had failed to furnish a police force, or one that was sufficient for the protection of persons and property, then a very different question would be presented for our consideration. Except so far as an efficient police department goes, which is for the protection of the public at large, the people of the state are not interested in any of the matters to which the said act of the legislature re-

lates, but the citizens of Evansville and Indianapolis, the two cities to which the act applies, are alone interested. It, therefore, becomes a question whether or not the legislature may take from the people of these two cities the right of local self-government, the right to manage and control their own purely local affairs in their own way, and place the management of all such local affairs under state control. We do not believe that the legislature has any such power. Before written constitutions, the people possessed the power of local self-government. It is conceded that the people of Indiana originally possessed all governmental power, and it will not be questioned but that they still possess such of that power as has not been delegated. All the power which the people have delegated is what has passed from them by the constitution. (Pomeroy, Constitutional Law [9th ed.], see title 'Centralization and Local Self-Government,' sec. 151 et seq.; 1 Dillon, Municipal Corporations [3d ed.] sec. 9; Cooley, Constitutional Limitations [5th ed.] 225; *People v. Hurlbut*, 24 Mich. 44; *People v. Detroit Common Council*, 28 Mich. 228; *People v. Mayor*, 51 Ill. 17; *People v. Lynch*, 51 Cal. 15; *People v. Albertson*, 55 N. Y. 50; *People v. Porter*, 90 N. Y. 68.) * * * No provision is found anywhere in the constitution which takes from the people the right of local self-government."

The third division of the syllabus in *State v. Denny, supra*, reads thus: "The right of local self-government in towns and cities was not surrendered upon the adoption of the constitution, but is still vested in the people of the respective municipalities, and the legislature cannot appoint officers to administer municipal affairs, its power ending with the enactment of laws prescribing the manner of selection and duties of the officers." Olds, J., delivered the opinion of the court in that case, and in discussing the question under consideration said: "It is contended by counsel for appellants that by the constitution of the state all power is vested in the legislative department of the government except such as is expressly

granted to the executive and the judiciary, or retained by the people in the constitution itself. We are not in harmony with counsel's theory of our state government, but we state it this way: At the adoption of the state constitution all power was vested in the people of the state. The people still retain all power, except such as they expressly delegated to the several departments of the state government by the adoption of the constitution. The legislative, executive, and judicial departments of the state have only such powers as are granted to them by the constitution. In the first section and the first article of the constitution it is declared 'that all power is inherent in the people.' It is contended by counsel that as certain rights were granted and certain other rights reserved by the people, therefore all rights were granted except such as were expressly reserved. The peculiarity of the theory is that while the people, by the constitution, made grants of power to three different departments of government, it is contended that all power that was at that time in the grantor, the people, passed to one branch of the government, viz., the political or legislative branch, and that it took all power not mentioned in the instrument, and the executive and judiciary took only such as was expressly granted to them and the people retained such only as was specifically named and reserved. It is certainly a novel method of construction, and contrary to all rules for construing contracts, deeds, wills, and other written instruments, and it seems to us that the proposition need but to be stated to prove its fallacy. In construing and giving an interpretation to the constitution we must take into consideration the situation as it existed at the time of its adoption, the fact expressed in the instrument that all power is inherent in the people, the rights and powers vested in and then exercised by the people, the existence of cities and towns and the right of local self-government exercised by them, and the laws in force and form of government existing at the time of its adoption. One of the fundamental principles of mu-

nicipal corporations is the right of local self-government, including the right to choose local officers to administer the affairs of the municipality."

Again, in the same opinion, after quoting from various authorities to establish that the inherent right of local self-government lies at the foundation of our institutions, it is stated that "we might quote from numerous other authorities to the same effect as the above, but we have quoted sufficient to show that the right of local self-government, including the right of the people of a municipality to select their own officers, was a sacred, fundamental principle and idea of municipal corporations, well founded, sacredly guarded, and long enjoyed by the people of the state at the time of the adoption of the constitution. As we interpret the theory of our state government, this right of local self-government, vested in, exercised, and enjoyed by the people of the municipalities of the state at the time of the adoption of the constitution, yet remains in them, unless expressly yielded up and granted to one of the branches of the state government by the constitution. And in the decision of the question presented in this case it is only necessary to determine whether or not that power is granted to the legislative branch of the government, as it is only it which has attempted to deprive the people of cities of the right to choose their own officers and administer their own local affairs."

After reviewing the various provisions of the constitution of Indiana relating to the legislative department of the state, the opinion continues: "The conclusion we have unhesitatingly reached is that the right of local self-government in towns and cities of this state is vested in the people of the respective municipalities, and that the general assembly has no right to appoint the officers to manage and administer municipal affairs; that the right of the general assembly ends with the enactment of laws prescribing the manner of selection and the duties of the officers. There is a class of officers whose duties

State v. Moores.

are general, but who act for the state in localities, which the general assemblies of some states have exercised the right to appoint, and courts have upheld the right to make such appointments; but this class of officers are constabulary or peace officers, those whose duties are to preserve the peace. In this case we do not deem it necessary to consider that portion of the law relating to peace officers, or to determine the right of the general assembly to appoint officers of that character under our constitution. The right of the state, however, to exercise such power must rest on the theory that the state owes protection to its citizens wherever they may be within the borders of the state, alike upon highways in a sparsely populated territory as upon the streets of a densely populated city, and to discharge such obligation has the right to exercise control over the peace officers of the state; but the law in question provides for taking exclusive control of the fire department within certain cities, appointing the officers and controlling the department, and compelling the cities to pay all the expenses. * * * Is it fair to presume that the people of this state, in the adoption of the constitution, did not intend to surrender the right of self-government in so far as to allow the legislature to even take charge of the fire department of every town and city of the state, and to appoint officers to take charge of and manage the affairs of such department and limit the legislative body to sixty-one days in every two years? We do not believe that such was the intention of the people at that time, nor do we believe that such is their understanding of the power of the legislature at the present time; nor is there any word or sentence in the constitution granting such power. * * * We hold that the right to provide and maintain a fire department in a town or city is one of the rights which are vested in the people of the municipalities, is to be exercised by them, and is not subject to legislative interference, except in so far as that body may prescribe rules to aid the people of the municipality in the exer-

cise of such right; that such right is an element of local
self-government which was vested in the people of the
municipalities at the time of the adoption of the con-
stitution and was not parted with by them; that so
much of the statute under consideration as relates to the
management and control of the fire department of cities
is unconstitutional and void."

Further along in the opinion it was decided that the
provisions of the statute relating to the fire and police
departments were so interwoven, connected with, and
dependent upon each other as to invalidate the entire
law. It is true that the statute was held unconstitutional
also on other grounds, one of them being that it attempted
to confer on the legislature executive functions, the
power to appoint the members of the board. But the
right of local self-government was not incidentally dis-
cussed in the opinion as has been suggested, but was a
prominent feature of the decision, and the law was ex-
pressly declared invalid as infringing the inherent right
of the municipalities embraced within the purview of the
law to choose their own local officers.

No case has come under the observation of the writer,
except *State v. Seavey*, 22 Neb. 454, which sustains a law
authorizing the appointment, either by the legislative or
the executive, of a board of fire and police commission-
ers for a municipal corporation. The decisions relied
upon and cited by Commissioner RYAN, excepting the
case above indicated, do not so hold, as a cursory ex-
amination discloses.

In *Daley v. City of St. Paul*, 7 Minn. 311, it was ruled
that the legislature possessed the power to appoint com-
missioners to lay out and establish a public street within
the corporate limits of the city of St. Paul, and to assess
the damages and benefits flowing from the taking of
property for that purpose. It is to be observed that only
seventeen lines of the official report of the opinion of the
court are devoted to a consideration of the question, and
the conclusion there reached is predicated entirely upon

*People v. Draper*, 15 N. Y. 533, in which last mentioned case the power of the legislature to appoint municipal officers was not involved nor decided. In *People v. Draper* the validity of an act of the state of New York was sustained which established a metropolitan police district, comprising the counties of New York, Kings, Richmond, and Westchester, and provided for the appointment of five commissioners by the governor with the advice and consent of the senate, who, with the mayors of New York and Brooklyn, constituted a board of police for said district. The law under consideration in that case was assailed as being in conflict with section 2, article 10, of the constitution of 1846 of the state of New York, which provided: 'All county officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties, or appointed by the board of supervisors or other county authorities, as the legislature shall direct. All city, town, and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns, and villages, or some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed, as the legislature may direct." The court held, and properly so, that the commissioners provided for by the act there under consideration were not county, city, town, or village officers, but mere officers created after the adoption of the constitution, and therefore the section of the constitution quoted expressly committed to the legislature the power to provide for election or appointment of such commissioners in any manner it deemed suitable. We have no similar constitutional provision in Nebraska.

In *Police Commissioners v. City of Louisville*, 3 Bush [Ky.] 597, there was under consideration an act of the

legislature providing for the organization of a police force for the city of Louisville and county of Jefferson. That decision is not in point here, for the very obvious reason the statute there involved provided for the election of the commissioners by the qualified voters of the city and county. Moreover, said commissioners were not municipal officers, nor was the question of the inherent right of the people to local self-government involved.

By article 133 of the constitution of the state of Louisiana of 1864 it was provided that the citizens of the city of New Orleans should have the right of appointing the several public officers necessary for the administration of the police of said city, and the said article gave the mayor the power to select the members of the police force of said city. The constitution of that state of 1868 omitted article 133 of that of 1864, and under the subsequent constitution the legislature created a board of police commissioners for the city of New Orleans to be appointed by the governor, which board was given full power to appoint and remove and control the officers and men of the police force of said city. This act was under consideration in *Diamond v. Cain*, 21 La. Ann. 309, where it was held that the omission in the constitution of 1868 of article 133 of the constitution of 1864 left the entire matter of the police regulations of New Orleans under the power and discretion of the legislature, and that the act there under review divested the mayor of the authority to appoint public officers. The right of local self-government was not discussed or adjudicated in that case.

In *Commonwealth v. Plaisted*, 148 Mass. 375, a law was sustained which created a board of police for the city of Boston to be appointed by the governor and council. The court in the opinion concede that the question of the invalidity of the law, on the ground that it deprived the city of the power of self-government in matters of internal police, was but little relied on in the argument; and the question was disposed of by the court without much

consideration and without the citation of a single authority in support of the conclusion reached. Moreover, that case is distinguishable from the one at bar, in that the officers provided for by that act had nothing to do with the control or management of the fire department of the city, while the statute before this court commits the whole subject of the appointment of firemen and the selection of the chief and other officers of the fire department of metropolitan cities, and the removal of such officers and men, to the board of fire and police commissioners created by said law. The authorities quite uniformly agree that the preservation of the public peace is essentially a matter of public concern; that the instrumentalities by which the same is effected, whether appointed by the governor or elected by a vote of the people, are agencies of the state and not of the municipalities, and that there exists a well defined distinction between matters which concern the municipality and those which pertain to the state at large. Conceding that the legislature, unless inhibited by the constitution, may provide the mode of selecting police officers, yet it has no power or authority to deprive the municipalities of the right to select officers whose duties are solely of a local nature, such as officers connected with the fire department. While the police control of cities in some of the states has been confided to boards of police commissioners appointed by some executive state officer or officers, yet the validity of such laws has been sustained solely on the ground that such officers are agencies of the state and not of the municipalities for which they were appointed.

State v. Hunter, 38 Kan. 578, and State v. Covington, 29 O. St. 102, are distinguishable on the ground above stated, since the act under consideration in each case provided for the appointment of a board of police commissioners to be appointed by state authority, and no power was given such board concerning the management and control of the fire department.

Gillespie v. City of Lincoln, 35 Neb. 34, is not an authority

in favor of the proposition that the state has the power to choose the officers or members of the fire department of a city. It was decided in that case that a municipal corporation was not liable for the negligent act of members of its fire department.

*State v. Seavey*, 22 Neb. 454, sustained a section of "An act incorporating metropolitan cities and defining, regulating and prescribing their duties, powers, and government," approved March 30, 1887, which provided for a board of fire and police commissioners for cities governed by that act, and for their appointment by the governor. It was held that the mode designated for the selection of the members of the board did not contravene the constitution. That decision is diametrically opposed to the conclusion reached by the writer and is the only one of its kind. It has been asserted, and probably not without foundation, that the section of the law there under consideration was adopted to give the party then in power in the state a supposed partisan advantage in the government of the affairs of the city of Omaha, and it may be the same motive influenced the adoption of the provision of the law of 1897 under review. However that may be, it affords no ground for declaring a law unconstitutional. The sole question that concerns the court is whether the law is repugnant to any express or implied limitations upon the power of the legislature. The act before us, as well as the one construed in *State v. Seavey*, *supra*, denied to the people of Omaha the power to choose a portion of their own local officers, and in so far as it did so is unconstitutional; for the right to provide and maintain a fire department in a city is one of the powers vested in the inhabitants of such municipality as an element of local self-government and is to be exercised by them without legislative interference, except to the extent that the lawmaking body may create rules to assist in the exercise of such right. It is to be deplored that a different conclusion was reached in the case just mentioned, as it is always embarrassing to a court to overrule

one of its own decisions. No member of the court has been more persistent than the writer in following our own adjudications, and would do so now were he not convinced that the rule announced in *State v. Seavey, supra,* is not only wrong, but is far-reaching in its consequences. The legislation which that opinion sustains tended to take from the people one of their reserved powers—the right of local self-government, one of the principles upon which our state fabric rests. If the legislature may authorize the governor to appoint a fire and police commission for cities of the metropolitan class, then there is nothing to prevent the lawmakers from taking from every city and town in the state the power to choose all of the local officers thereof, except police judge, which position is made elective by the constitution, and empower the governor to appoint all municipal officers, except the one just named. The mind revolts when the doctrine of the *Seavey Case* is carried to its legitimate extent. The denial to the people of the right to govern themselves is undemocratic, and if such doctrine is enforced, we could no longer boast of "a government of the people, for the people, and by the people." The demurrer to the application, as well as the demurrer to the answer and cross-petition of the interveners, should be overruled. The demurrer to the answer of the respondents, the governor's appointees, should be sustained, and a judgment of ouster entered against them.

It will be observed that section 168 of chapter 12*a*, Compiled Statutes, attempts to make persons engaged in any one of certain enumerated vocations ineligible to the office of police commissioner. The omission to discuss that provision must not be construed as impliedly sustaining its constitutionality. We merely refrain from now expressing an opinion on the subject.

JUDGMENT ACCORDINGLY.

HARRISON, C. J., concurring.

RYAN, C., dissenting.

We cannot concur in the views of a majority of the court. This action of quo warranto was instituted in this court upon the relation of the attorney general to test the right of J. H. Peabody, D. D. Gregory, William C. Bullard, and R. E. L. Herdman to serve as fire and police commissioners of the city of Omaha under and by virtue of appointments of the governor of this state. Certain other parties were made defendants or became such by intervention, but neither their claims nor status need be described, for the sole question presented by the demurrer to the answer asserting the validity of the said appointments is whether the statute, under which the above indicated appointments were made, is valid. This statute is embodied in the Compiled Statutes as chapter 12*a*, of which the sections to be discussed are 166 and 169. By these it is provided that in cities of the class of Omaha there shall be a board of fire and police commissioners, to consist of the mayor and four electors of the city, who shall be appointed by the governor. All powers and duties connected with and incident to the appointment, removal, government, and discipline of the officers and members of the fire and police departments of the city, under such rules and regulations as may be adopted by the board of fire and police commissioners, are vested in that board, to which are delegated certain defined powers proper to enable it to perform its functions. It is argued against the validity of the above noted statutory provisions that by them the people of Omaha are deprived of the right of local self-government. It is not claimed that these sections contravene any express provision of the constitution prescribing how municipal officers must be appointed, but that they deny the right of local self-government, which exists independently of our constitution, upon principles which are recognized in the Declaration of Independence and the federal constitution and are illustrated in the evolution of our forms

of government, state and national. It is conceded that the case of *State v. Seavey*, 22 Neb. 454, must be overruled if this contention is sustained, and accordingly we shall consider whether or not there have been advanced arguments of sufficient weight and cogency to justify the course indicated.

It seems to be assumed that if *State v. Seavey* is overruled there will result no confusion or conflict by reason of other decisions of this court. In this assumption we think counsel for plaintiff are mistaken. In *Magneau v. City of Fremont*, 30 Neb. 843, it was said: "It has been the uniform holding of this court that the constitution is not a grant but a restriction of legislative power, and that the legislature may legislate upon any subject not inhibited by the constitution. (*State v. Lancaster County*, 4 Neb. 537; *State v. Dodge County*, 8 Neb. 124; *Hanscom v. City of Omaha*, 11 Neb. 37; *State v. Ream*, 16 Neb. 685; *Shaw v. State*, 17 Neb. 334.)" In *State v. Moore*, 40 Neb. 854, there was under consideration the validity of a specific appropriation made by the legislature for the relief of Scott's Bluff county, and it was said: "The next reason assigned by the auditor for not drawing the warrant to pay the appropriation is 'that the act making the appropriation is contrary to the letter and spirit of the constitution of the state of Nebraska.' We quote Cooley, Constitutional Limitations 4th ed., p. 210, as follows: 'When a law of congress is assailed as void, we look into the national constitution to see if the grant of specified powers is broad enough to embrace it; but when a state law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the constitution of the United States, or of the state, we are unable to discover that it was prohibited. We look in the constitution of the United States for grants of legislative powers, but in the constitution of the state to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the state is vested

in its creation. Congress can pass no laws but such as the constitution authorizes, either expressly or by clear implication, while the state legislature has jurisdiction of all subjects on which its legislation is not prohibited. The lawmaking power of the state recognizes no restraints and is bound by none, except such as are imposed by the constitution. That instrument has been aptly termed a legislative act by the people themselves in their sovereign capacity, and is, therefore, the paramount law. Its object is not to grant legislative power, but to confine and restrain it. Without the constitutional limitations, the power to make laws would be absolute.' Tested by the rule quoted from this eminent jurist, there is nothing in the constitution of Nebraska that prohibits the legislature of the state, representing, as it does, the sovereignty of the people, from appropriating money to reimburse a county for expenses incurred by it in the prosecution of criminals." To sustain the contention against the right of the four commissioners appointed by the governor we must therefore not only directly overrule *State v. Seavey, supra,* but we must go a step further and discard the principle just quoted from *Magneau v. City of Fremont, supra.* In the first paragraph of the syllabus of *Boyes v. Summers,* 46 Neb. 308, it was said: "When this court is asked to declare a statute unconstitutional, the particular section of the constitution which it is claimed the law infringes should be pointed out in the brief filed," and by analogy we are led to believe that there should be a like certainty that a statute is void by reason of considerations other than a conflict with a constitutional provision.

In entering upon the discussion of the identical question with which we are now concerned it was said by Judge Dillon, with a conservatism not always the characteristic of text-writers: "The adjudged cases exhibit some contrariety of opinion respecting the scope of legislative authority over municipal corporations, or rather respecting the question how far corporations, viewed as

legal personalities, and as such representing special
rights of the community that is incorporated, are within
the operation or protection of the usual constitutional
restraints upon legislative power. The present chapter
will be devoted to a consideration of this subject. In
dealing with questions of this complex nature we must
beware of broad propositions and avoid general specula-
tions. The only wise and safe course is to keep near the
shore and within the light of actual adjudications, ac-
companying these with such observations as seem to be
required." With this cautionary language in mind the
case of *State v. Denny*, 118 Ind., 449, very confidently re-
lied upon by counsel for the relator, may be profitably
considered. A statute of the state of Indiana provided
that in all cities of the state, of 29,000 or more inhab-
itants, there should be established within and for such
cities a board of metropolitan police and fire department,
to consist of three commissioners. The members of the
first board or boards were to be elected by the general
assembly upon the taking effect of the act, and said board
was empowered to select a superintendent of police, cap-
tains, sergeants, detectives, and such other officers and
patrolmen as the said board might deem advisable. This
board was also clothed with power to remove or suspend
any member of the police force and provide rules of
discipline, and to make and promulgate general and
special orders through the superintendent, who was con-
stituted the executive head of the force. In the discus-
sion of the provisions of the above act there were used
certain expressions with reference to local self-govern-
ment, and those expressions have been seized upon as
material with which to fortify the position of the relator.
It may be that the court was influenced to its conclusion
adverse to the validity of the act by the fact that the
right of local self-government was denied to people resi-
dent within cities of the class indicated; but even if this
is true, a careful consideration of the line of argument
of the court will disclose that this was not the para-

mount consideration, but that this action of the legislature in reserving to itself the power of appointment of the three commissioners provided by the act was a very prominent, if not the controlling, factor. After a statement of the facts and a discussion of the authentication of the act in question there is found in the opinion this language: "We next consider whether or not the act and its provisions are within the scope of legislative authority under the constitution of the state. It is contended by counsel for appellants that, by the constitution of the state, all power is vested in the legislative department of the government, except such as is expressly granted to the executive and the judiciary or retained by the people in the constitution itself. We are not in harmony with counsel's theory of our state government, but we state it this way: At the adoption of the state constitution all power was vested in the people of the state. The people still retain all power, except such as they expressly delegated to the several departments of the state government by the adoption of the constitution. The legislative, executive, and judicial departments of the state have only such powers as are granted to them by the constitution. In the first section and first article of the constitution it is declared 'that all power is inherent in the people.' It is contended by counsel that as certain rights were granted and certain other rights reserved by the people, therefore all rights were granted except such as were expressly reserved. * * * As we interpret the theory of our state government, this right of local self-government, vested in, exercised, and enjoyed by the people of the municipalities of the state at the time of the adoption of the constitution, yet remains in them, unless expressly yielded up and granted to one of the branches of the state government by the constitution. And in the decision of the question presented in this case it is only necessary to determine whether or not that power is granted to the legislative branch of the government, as it is only it which has attempted to de-

prive the people of cities of the right to choose their own officers and administer their local affairs." Following the above quoted language there was a discussion of the powers of the legislative branch of the state government as defined by the constitution of the state of Indiana. It would be unprofitable to closely follow this discussion, but from it we shall quote the following language: "Under our system of government, divided into three separate, distinct, co-ordinate branches, the legislative and judicial departments may exercise appointing power to offices peculiarly related to and connected with the exercise of their constitutional functions, and to maintain their independent existence; that is to say, the general assembly may elect or appoint the officers of their respective branches and relating to their department of the government; courts may appoint administrators, guardians, master commissioners, and such officers as are necessary to the free and independent exercise of power conferred by the constitution, but the appointment of officers generally is naturally and properly an executive function. (*Taylor v. Commonwealth*, 3 J. J. Marsh. [Ky.] 401; Letter of Thomas Jefferson to S. Kerchival, dated November 21, 1816; *Marbury v. Madison*, 1 Cranch [U. S.] 137; *Wood v. United States*, 15 Ct. of Claims [U. S.] 151; *Perkins v. United States*, 20 Ct. of Claims [U. S.] 438; *United States v. Perkins*, 116 U. S. 483; *State v. Covington*, 29 O. St. 102; *Achley's Case*, 4 Abb. Pr. Rep. [N. Y.] 35; *State v. Kennan*, 7 O. St. 546; *People v. McKee*, 68 N. Car. 429; *State v. Tate*, 68 N. Car. 546; Pomeroy, Constitutional Law sec. 643; Federalist pp. 373—387, letters 47 and 48.) The only remaining provision which we think it can possibly be claimed granted any power to the general assembly to fill offices is section 1, article 15, which provides: 'All officers whose appointments are not otherwise provided for in this constitution shall be chosen in such manner as now is, or hereafter may be, prescribed by law.' * * * As applied to town officers, the language used certainly cannot be construed as an intention on

the part of the people to surrender their right of local self-government and as granting the power to the general assembly to elect or appoint local officers in the various towns of the state. * * * Section 3, article 6, provides that 'such other county and township officers, as may be necessary, shall be elected or appointed in such manner as may be prescribed by law.' We have not placed any new or forced construction on the constitution, nor have we advanced any new or strange theory of our state government, but are adhering to the well recognized theory of our government, and walking in the same beaten path that all have walked since the adoption of the constitution. Since its adoption, and before, the people of the counties, townships, cities, and towns have exercised the exclusive right of selecting and choosing their local officers, the legislature has recognized their right to do so, and prescribed the manner of election, and now, for the first time, the general assembly has claimed to itself the power of selecting such officers for two cities of the state. We have quoted and considered all the provisions of the constitution granting power to the legislative department of the state government, and are clearly of the opinion that the legislature is granted no such power as is exercised in the passage of this act, in providing for the election of and in electing the officers contemplated by the act; but, indeed, it is not earnestly contended by counsel that any such power is by express terms granted, but it is contended, as stated in the outset, that by the creation of the departments of government by the constitution all power, vested in the legislature that was not, by express terms, reserved to the people or granted to the executive or judicial departments, and that the burden rests on him who asserts that a law is unconstitutional to point out the provisions of the constitution that forbid its passage." After briefly arguing that a statute might be declared unconstitutional even though it might be impossible to indicate any express provision of the con-

stitution as being one with which such statute might conflict the opinion continues as follows: "The conclusion we unhesitatingly reach is, that the right of local self-government in towns and cities of this state is vested in the people of the respective municipalities, and that the general assembly has no right to appoint the officers to manage and administer municipal affairs; that the right of the general assembly ends with the enactment of laws prescribing the manner of selection and duties of the officers. There is a class of officers whose duties are general, but who act for the state in localities, which the general assemblies of some states have exercised the right to appoint, and courts have upheld the right to make such appointments; but this class of officers are constabulary or peace officers, those whose duties are to preserve the peace. In this case we do not deem. it necessary to consider that portion of the law relating to peace officers or to determine the right of the general assembly to appoint officers of that character under our constitution. The right of the state, however, to exercise such power must rest on the theory that the state owes protection to its citizens wherever they may be within the borders of the state, alike upon highways in a sparsely populated territory as upon the streets of a densely populated city, and to discharge such obligation has the right to exercise control over the peace officers of the state; but the law in question provides for taking exclusive control of the fire department within certain cities, appointing the officers and controlling the department and compelling the cities to pay all of the expenses. Although some authority may be found to support such right on the part of the legislature, we think it is in conflict with our system of state government and derogatory to the rights of the people."

A very full consideration has been given *State v. Denny, supra,* because it was in argument relied on as distinctly sustaining the contention of relator's counsel that the law which we now have under review must be declared

38

unconstitutional because it deprives the citizens of
Omaha of the right of local self-government. It is quite
clear that the fact the legislature had arrogated to itself
the right to name the three commissioners by whom the
city officers were to be appointed and might be removed
had great weight with the court, for by that tribunal
this was described as an executive and not a legisla-
tive function. Moreover, even under these circumstances,
the court very strongly intimated that the appointment
by commissioners of the police officers of the city as part
of the constabulary force of the state might be upheld,—
a proposition afterwards sanctioned in *State v. Kolsem*,
130 Ind. 434. It was doubted in *State v. Denny, supra*,
whether the consideration with respect to police officers
tended to countenance the control of the fire department
by state commissioners, but in this state the relations of
the fire departments of cities to the state has been held
to be the same as the relation of police forces of cities.
(*Gillespie v. City of Lincoln*, 35 Neb. 34.) As we understand
the opinion in *State v. Denny, supra*, the right of local
self-government was discussed somewhat incidentally,
and alone might not have been sufficient to have brought
the court to the conclusion which was reached; and even
if we are wrong in this conception of the gist of the argu-
ment, the intimation of that court was very strongly that
appointments of police officers by state authorities could
be justified on a ground which in this state would justify
like appointments in the fire departments. As these two
classes embrace the subject-matter herein in controversy
the case of *State v. Denny, supra*, cannot be considered as
very satisfactorily supporting the contention of counsel
for the relator with respect to the city's right of local
self-government.

It was urged that the supreme court of Michigan had
repeatedly upheld the right of local self-government in
a manner and to an extent which should be followed
in the case at bar. The opinion in one of the cases cited
(*Commissioners v. Detroit*, 28 Mich. 228) was written by

Judge Cooley, and as he has referred thereinto the other cases in that state we shall accept his description of their scope. In *Commissioners v. Detroit, supra,* there was under consideration a statute whereby the legislature of Michigan had created a board of park commissioners for the city of Detroit. This board had power and authority to adopt plans for a public park or boulevard, or both, with the necessary avenues or approaches thereto, for the city of Detroit, and for these purposes the board might select the needful lands, either wholly or in part, within the city or any of the adjacent townships, and might acquire and purchase lands at a cost of not to exceed $300,000. When the site of a park or boulevard should be selected the board might lay before the city council estimates of the expenses necessary to carry out its plans, and the said council was thereupon required to provide the money for such expenses by the issue and sale of city bonds. The action was for a mandamus to compel the issue and sale of bonds, the preliminaries thereto having, as alleged, been complied with. On this subject there was in the opinion this language: "The proposition that there rests in this or any other court the authority to compel a municipal body to contract debts for local purposes against its will is one so momentous in its importance, and so pregnant with possible consequences, that we could not fail to be solicitous when it was presented that its foundations should be thoroughly canvassed and presented, and that we might have before us in passing upon it all the considerations that could be urged in its support. * * * In *People v. Hurlbut,* 24 Mich. 44, we considered at some length the proposition which asserts the amplitude of legislative control over municipal corporations, and we there conceded that when confined, as it should be, to such corporations as agencies of the state in its government, the proposition is entirely sound. In all matters of general concern there is no local right to act independently of the state; and the local authorities cannot be permitted to determine for themselves whether

they will contribute through taxation to the support of
the state government, or assist when called upon to sup-
press insurrections or aid in the enforcement of the
police laws. Upon all such subjects the state may exer-
cise compulsory authority, and may enforce the perform-
ance of local duties, either by employing local officers
for the purpose or through agents or officers of its own
appointment. The same doctrine was declared in *People
v. Mahaney*, 13 Mich. 481, and in *Bay City v. State Treas-
urer*, 23 Mich. 503. * * * Whoever insists upon the
right of the state to interfere and control by compulsory
legislation the action of the local constituency in matters
exclusively of local concern, should be prepared to de-
fend a like interference in the action of private corpora-
tions and of natural persons. It is as easy to justify, on
principle, a law which permits the rest of the community
to dictate to an individual what he shall eat, and what
he shall drink, and what he shall wear, as to show any
constitutional basis for one under which the people of
other parts of the state, through their representatives,
dictate to the city of Detroit what fountains shall be
erected at its expense for the use of its citizens, or at
what cost it shall purchase, and how it shall improve and
embellish a park or boulevard for the recreation and en-
joyment of its citizens. The one law would rest upon
the same fallacy as the other, and the reasons for oppos-
ing and contesting it would be the same in each case."
There has been sufficient quoted from *Commissioners v.
Detroit, supra*, to disclose how slightly it tends to coun-
tenance the principle herein contended for, and the prin-
ciple on which this case was decided was determinative
of the controversy in *People v. Lynch*, 51 Cal. 15. Section
2, article 10, of the constitution of the state of New
York in force at the time the cited cases from the courts
of that state were decided was in the following language:
"All county officers, whose election or appointment is
not provided for by this constitution, shall be elected by
the electors of the respective counties or appointed by

the boards of supervisors or other county authorities,
as the legislature shall direct. All city, town, and village
officers, whose election or appointment is not provided
for by this constitution, shall be elected by the electors
of such cities, towns, and villages, or of some division
thereof, or appointed by such authorities thereof as the
legislature shall designate for that purpose. All other
officers, whose election or appointment is not provided
for by this constitution, and all officers whose offices
may hereafter be created by law, shall be elected by the
people, or appointed, as the legislature may direct." It
is very clear that the above provisions as to the election
or appointment of city, town, and village officers render
inapplicable the cases cited to sustain the proposition
that there exists a right of local self-government inde-
pendently of constitutional authority. Indeed, an in-
ference might very plausibly be drawn that the legisla-
ture could have provided for the government of cities,
towns, and villages in the absence of the constitutional
restriction noted, and that the existence of such a con-
stitutional restriction raises a presumption of its ne-
cessity.

It is probable we may have omitted mention of some
cases relied upon in the voluminous briefs of counsel for
the relator, but we believe we have noted those most
confidently relied upon, and shall now address ourselves
to a review of the cases cited by the opposing counsel.

In *Commonwealth v. Plaisted*, 148 Mass. 375, there was
under consideration a statute whereby the governor of
the state of Massachusetts, with the advice and consent of
the council, was required to appoint from the two princi-
pal political parties three citizens of Boston, who should
constitute a board of police of said city. The police of
the city was to be appointed, and was subject to removal
by this board. Referring to this act of the legislature the
court said: "It is also suggested, though not much in-
sisted on, that the statute of 1885, c. 323*, is unconstitu-
tional, because it takes from the city the power of self-

government in matters of internal police. We find no
provision of the constitution with which it conflicts, and
we cannot declare an act of the legislature invalid be-
·cause it abridges the exercise of the privilege of local self-
government in a particular in regard to which such
privilege is not guarantied by any provision of the con-
stitution. While the constitution recognizes our system
of town governments as an inherent part of our general
system of government, so that the legislature could not
abolish the town system without coming in contact with
some part of its provisions, yet in most respects it leaves
the power and duty of providing laws for the govern-
ment of the towns and cities in the discretion of the
legislature.  *  *  *  The several towns and cities are
agencies of government largely under the control of the
legislature. The powers and duties of all the towns and
cities, except so far as they are specifically provided for
in the constitution, are created and defined by the leg-
islature, and we have no doubt that it has the right in
its discretion to change the powers and duties created by
itself and to vest such powers and duties in officers ap-
pointed by the governor, if in its judgment the public
good requires this, instead of leaving such officers to be
elected by the people or appointed by the municipal au-
thorities."

In the year 1860 the legislature of Maryland by stat-
ute provided for a new police system, and to carry it
into effect named certain commissioners, upon whom
were conferred the powers necessary for that purpose.
Contrary to the views expressed in *State v. Denny, supra,*
the court of appeals of Maryland sustained the exercise
of this appointing power by the legislature. (*Baltimore v.
State,* 15 Md. 376.) In the opinion there was the follow-
ing language: "It is conceded that the legislature was
not under any obligation to confer the power of appoint-
ment on the executive; by this clause of the constitution
the power was placed there, in the event of a different
mode not being prescribed in the law. But, it is said, it

ought to have been delegated to the people or local authorities of the city of Baltimore. In the absence of any such requirement of the legislature, we do not perceive that they were under a duty to make such delegation of the appointing power. The constitution surely designed to repose some discretion in the legislature, both over the mode of appointment and the propriety and necessity of passing any law on the subject to which the exercise of that power might relate. It seems difficult to suppose that the people, through the constitution, would intrust to that branch of the government nearest to the source of power the right to create an office and to indicate others to appoint the officers, and be unwilling to place the appointment with the legislature itself. The constitution must receive an interpretation according to the sense in which the people are supposed to have understood its language; but it ought, also, to be construed with reference to the previous legislation of the state. (*State v. Wayman*, 2 G. & J. [Md.] 285.) And when such power has been exercised by the legislature from the earliest period of the government, is it unreasonable to suppose that the people were aware that the same thing might occur again unless prohibited by the constitution? If there is no prohibition, express or implied, it would result from this view that the people intended the legislature should continue to exercise the power."

By an act of the legislature of Kentucky there was established a board of police for the city of Louisville and county of Jefferson. This board was elected by the voters of the city as provided in the aforesaid act, and its right to select police officers pursuant to the provisions of the act in question was denied by the mayor of said city. The question thereby raised was not identical with that presented to us, but in the consideration of the question which was presented there was employed this language: "It is now a well settled and universally recognized American doctrine that the state legislature represents the sovereignty of the people of the state in all

things not delegated to the federal government, nor prohibited by the United States constitution to the states, nor prohibited by the state constitution." (*Police Commissioners v. City of Louisville*, 3 Bush [Ky.] 597.)

In *Diamond v. Cain*, 21 La. Ann. 309, there was under consideration an act of the legislature whereby was created a board of commissioners of the city of New Orleans empowered to remove and appoint the police force of said city. The mayor to whom had been intrusted the powers which were superseded by the provisions of said act insisted that it was unconstitutional, and on that theory appointed a chief of police. The contest was by quo warranto proceedings instituted by the claimant of this office by virtue of the mayor's appointment, against the claimant appointed by the aforesaid board of commissioners, and without the statement of any particular principle applicable to the facts of the case at bar it was held by the supreme court that the appointee of the board was entitled to hold the office in dispute.

In *State v. Hunter*, 38 Kan. 578, there was questioned by quo warranto proceedings the validity of an act of the legislature of Kansas by virtue of which the executive council of that state was authorized to appoint a board of police commissioners, by which board there were required to be appointed a police judge, a marshal, a chief of police, and other police officers. The right of the defendant depended upon the validity of his appointment by said board to fill the office of police judge of the city of Leavenworth. In the opinion there was this language: "The point has been made, though not much contended for, that police government by commission is illegal. In effect, it is said to be opposed to the fundamental theory of self-government, and denies to the people of the district the right to select their own officers from their own number. Whatever may be said regarding the policy of placing the police administration of cities in a board of police commissioners who are chosen by state officers, rather than through the electors of the cities,

there can be no doubt that the legislature has the power
to do so.   The constitution imposes no ·limitations upon
the legislature in respect to the agencies through which
the police power of the state shall be exercised.   It may
be conferred upon the officers of local municipalities ·
chosen by the people resident therein, or, if deemed ex-
pedient, it may be vested in officers or persons otherwise
selected.   Cities are but agencies of the state created to
aid in the conduct of public affairs.   The functions of
cities and their officers are prescribed by the legislature,
and it rests in the sovereign discretion of that body to
say how much of the police power shall be exerted by the
municipality."

   *Daley v. City of St. Paul,* 7 Minn. 311, was an action for
the recovery of damages for the establishment of a pub-
lic street or road by commissioners appointed by the
legislature of the state, and it was held that in the ap-.
pointment of such commissioners the legislature had not
acted outside the scope of its powers, and accordingly the
city was liable for the damage awarded.

   In *State v. Covington,* 29 O. St. 102, the rights of the
defendants, as members of the board of police commis-
sioners and of the board of health for the city of Cin-
cinnati, were challenged by quo warranto proceedings
and a demurrer to an answer justifying the title of de-
fendants under the provisions of said act was overruled.
The review of the authorities would not be complete if
there was omitted a quotation from the case last cited of
language applicable to certain provisions of our consti-
tution.   Section 26—the closing section of our bill of
rights—is as follows:   "This enumeration of rights shall
not be construed to impair or deny others retained by the
people, and all powers not herein delegated remain with
the people."   In *State v. Covington, supra,* McIlvaine, J.,
said:  "The principal objections urged by counsel for re- .
lator against the validity of this statute are based on
the first clause of section 2, article 1, of the constitution,.
which declares 'all political power is inherent in the

people,' and the 20th section of the article, which is as follows: 'This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers not herein delegated remain with the people.' The first of these declarations enunciates the foundation principle of our government, to-wit, that the people is the source of all political power; but it was not intended as a denial of the power or right of delegation and representation. If this were not otherwise palpable, it would be made so by the second declaration above named, to-wit, 'and all powers not herein delegated remain with the people.' This last clause means exactly what its words import; but even from them a plain implication arises that all the powers in and by the constitution delegated do not remain with the people but are vested in the agents and officers of the government, to be exercised by them alone. Among the powers delegated by the constitution is the following, article 2, section 1: 'The legislative power of the state shall be vested in the general assembly.' Now, whatever limitations upon the power thus delegated to the general assembly may be found in other provisions of the constitution, it is quite clear that section 20 of the first article does not impose any limitations upon it whatever. That section only declares that powers not delegated remain with the people. It does not purport to limit or modify delegated powers. It cannot be doubted that the terms of the constitution whereby the legislative power of the state is vested in the general assembly are comprehensive enough to authorize the enactment in question. Rules and regulations for local municipal government of cities and villages are subjects of, and are as clearly within the scope of, legislation as are those which concern the state at large. Cities and villages are agencies of the state government. Their organization and government are under the control of the state, and every law which affects them must emanate from the general assembly, where the legislative power of the state is vested. Now,

it is true that the terms in which this grant of power is made to the general assembly are restrained and limited by many inhibitory provisions contained in the instrument; but we find no express inhibition against such legislation as is contained in this statute. The question, therefore, is, is there an implied inhibition against it? It is claimed by counsel for the relator, as we understand their arguments, that such inhibition is implied from the provisions quoted above from the bill of rights, especially when they are considered in connection with the history and practice of the state at and previous to the adoption of the constitution. The circumstances referred to by counsel, it is claimed, would show that previous to the adoption of the present constitution in 1851 the police of the several cities and villages within the state had been elected by the electors resident therein or appointed by boards or officers elected by the electors. And, therefore, it is to be inferred from the above declaration in the bill of rights, to-wit, 'and all powers not herein delegated remain with the people,' that the power to change the mode of election or appointment of the police force of cities and villages was intended to be withheld from the general assembly. To this argument we desire to express our unqualified dissent. By such interpretation of the constitution the body of laws in force at the time of its adoption would have become as permanent and unchangeable as the constitution itself, for such argument would apply with equal force to every subject of legislation concerning which no special direction is contained in the constitution. Indeed, the true rule for ascertaining the powers of the legislature is to assume its power under the general grant ample for any enactment within the scope of legislation, unless restrained by the terms or the reason of some express inhibition."

The persistency with which we have been urged to recede from the views expressed in *State v. Seavey, supra,* has induced us to re-examine the grounds upon which

that case was decided. The importance of the question involved should be accepted as our sufficient apology for the extended discussion into which we have necessarily been led in the accomplishment of this purpose. We are now more than ever satisfied of the correctness of the proposition laid down in *State v. Seavey, supra,* that "The state is the unit of political power and is responsible, through its legislature and executive, for the preservation of the peace, morals, education, and general welfare of the people, and in the discharge of the duties necessary for these purposes they are limited only by the supreme constitution of the government, the laws passed pursuant thereto, and our own constitution and laws."

For the reasons given in *State v. Covington, supra,* the legislature, in the exercise of its powers in the respect challenged in this case, did not violate any provision of our bill of rights.

SULLIVAN, J., and IRVINE, C., concurring.